SEALED

FILED

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

2013 JAN -3  AM 10: 26

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
        DEPUTY CLERK

| | |
|---|---|
| UNITED STATES of AMERICA <u>ex rel.</u> LISA WHEELER,<br><br>Plaintiff–Relator,<br><br>v.<br><br>UNION TREATMENT CENTERS, L.L.C.; UNION TREATMENT CENTER - AUSTIN, L.L.C.; UNION TREATMENT CENTER-KILLEEN, L.L.C.; UNION TREATMENT CENTER-SAN ANTONIO L.L.C.; UNION TREATMENT CENTER-CORPUS CHRISTIE, L.L.C; NEW HELP CLINICS, P.A.; WILLIAM SONIA, JR.; GARRY CRAIGHEAD; and CHRISTINE CRAIGHEAD,<br><br>Defendants | Civil Action No.:<br><br>**S A13 CA0004  H**<br><br>Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)<br><br><br>**PLAINTIFF–RELATOR DEMANDS A TRIAL BY JURY ON All COUNTS** |

## COMPLAINT

On behalf of the United States of America, Plaintiff-Relator Lisa Wheeler brings

this action under the False Claims Act against Defendants Union Treatment Centers,

LLC, Union Treatment Center-Austin, LLC; Union Treatment Center-Killeen, LLC;

Union Treatment Center- San Antonio, LLC; Union Treatment Center-Corpus Christie,

LLC, New Help Clinics P.A., William Sonia Jr., Garry Craighead, and Christine

Craighead.

## INTRODUCTION

1.    This action concerns the Defendants' scheme to overbill federal and state government entities, particularly those that provide worker's compensation, for medical services provided at their seven chiropractic and rehabilitative centers in the State of Texas.

2.    The scheme was deceptively simple. The Defendants systematically and intentionally inflated the bills for the medical services provided by the seven centers' medical personnel. Each medical professional identified the reimbursable services that they provided to the centers' patients in a format known as a "superbill." All of the centers' superbills were then submitted to the Austin office for processing.  Before the bills were sent to Federal officials for payment, however, the Defendants improperly increased the scope of the services allegedly provided to the centers' patients.   Thus, federal government agencies routinely paid for medical services that were never provided, resulting in tens of millions of dollars in illicit payments.

## PARTIES

3.    Plaintiff-Relator Dr. Lisa Wheeler (the "Relator") is an individual who resides in Round Rock, Texas.  She is a chiropractor licensed to practice in the State of Texas. Between April 2007 and January 2012 she was employed by defendant Union Treatment Centers, L.L.C., and Union Treatment Center-Austin, L.L.C.

4.    Defendants Union Treatment Center's LLC, Union Treatment Center-Austin LLC, Union Treatment Center-Killeen LLC, Union Treatment Center- Corpus Christie LLC and Union Treatment Center-San Antonio, LLC are Texas limited liability

2

corporations, each of which is owned by defendant William Sonia and managed by defendant Garry Craighead. These are the corporate entities that owned the medical centers which fraudulently billed the Government. The relator shall refer to these entities collectively, together with two clinics operated under the name "New Help Clinics," as "UTC".

5.      Defendant New Help Clinics P.A. is a professional association that was purchased by UTC.  New Help Clinics P.A. consists of two medical centers, one in Dallas, Texas and the other in Fort Worth, Texas.

6.      Defendant William Sonia Jr. is an individual who resides in Dallas, Texas. He is the owner of UTC.

7.      Defendant Garry Craighead is an individual who resides in Leander, Texas.  He is the President and chief executive officer of UTC.

8.      Defendant Christine Craighead is an individual who resides in Leander, Texas.  She is the chief operating officer of UTC, and is responsible for processing all billing for UTC.

## JURISDICTION AND VENUE

9.      Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA").  In addition, the FCA specifically confers jurisdiction upon the United States District Court, 31 U.S.C. § 3732(b).

10.     This District Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States of America.

11.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants regularly transact business in this judicial district.

12.     The Relator is unaware of any public disclosure of the information or allegations that are the basis of this Complaint.  In the event that there has been a public disclosure, the Relator is the original source of the information and allegations contained in this Complaint.  Prior to the filing of this action, the Relator voluntarily provided the United States Government with information regarding the false claims that are the subject of this Complaint as early as January 2012.

## FACTUAL ALLEGATIONS

### A. The False Claims Act

13.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

14.     The False Claims Act makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of federal law for which the United States may recover three times the amount

of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

15.     The False Claims Act makes any person who conspires to commit a violation of the FCA liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

16.     The False Claims Act defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient.  Any claim submitted by a medical provider for a payment under a federal program, such as reimbursement for providing medical services to injured federal or postal workers under the Federal Employees Compensation Act ("FECA") constitutes a claim under the False Claims Act.

### B. Claims under the Federal Employees' Compensation Act

17.     FECA provides workers' compensation coverage for approximately three million federal and Postal employees for employment-related injuries and occupational diseases.  In addition to wage replacement and survivor benefits, federal and Postal employees who are injured on the job are given coverage for medical benefits and vocational rehabilitation.  FECA benefits are administered by the Department of Labor through the Office of Workers' Compensation Programs ("OWCP").  The OWCP division that manages medical benefits and vocational rehabilitation assistance for

federal employees returning to work is the Division of Federal Employees'
Compensation ("DFEC").

18.     FECA benefits are wholly funded by the United States.  DFEC has
reported that for fiscal year 2011, $913 million in medical and rehabilitation services
was paid for FECA workers' compensation claims.  DFEC paid out $2.98 billion in total
benefits in fiscal year 2011.  To promote prompt payment, compensation and services,
DFEC pays all of these claims through its own funds as provided by the government.
Each individual federal agency (and the Postal Service), however, is ultimately
responsible for paying for FECA benefits; DFEC administers a "chargeback" process
once per year, through which government agencies reimburse DFEC for benefits paid
(but not for DFEC's overhead).

19.     Unlike traditional workers' compensation programs, where most medical
professionals may bill commercial insurers for treating patients covered under workers'
compensation, not all physicians, D.O.s, chiropractors, therapists or other medical
personnel are authorized by DFEC to perform services eligible for FECA
reimbursement.  As a result, federal employees' organizations and Postal unions
frequently take a significant role in steering their members to doctors who are eligible to
treat patients covered by FECA.  Accordingly, clinics which purport to specialize in
treating claims covered by FECA, such as UTC, must have very close relationships with
the employee organizations and unions who can direct injured federal workers to their
establishments.

20.     Registered FECA medical providers bill the program for covered services using the same billing codes used by Medicare: CPT codes.  FECA, however, reimburses at a higher rate than does Medicare; FECA is "Medicare plus."  The exact percentage of the "plus" is dependent on location and varies by zip code, but in UTC locations, OWCP reimbursed at approximately 125-130% of the Medicare rates for CPT codes.

### C. UTC and Its Principals

21.     UTC operates seven medical clinics which treat patients whose injuries are covered by workers compensation, particularly federal and postal workers whose claims are covered by FECA.  When the Relator started working as a chiropractor for UTC, it operated only one center, in Austin. By the time she was summarily dismissed in January 2012, UTC had grown to seven centers, adding clinics in San Antonio, Kileen, Corpus Christi, Beaumont, Dallas and Fort Worth.  The Dallas and Fort Worth centers are operated under the name New Help Clinics, and the remainder operate under the name Union Treatment Centers.  As set forth herein, the finances and billing of all seven centers are managed from the main UTC office in Austin.   UTC employs chiropractors, D.O.s, physicians, podiatrists, and other medical personnel to treat patients.  Under Texas law, medical doctors cannot be employed by an entity owned by a chiropractor; instead, UTC's medical doctors are paid through a consulting arm of UTC called CCM&D.

22.     Since almost all of UTC's patients are injured on the job, the vast majority of UTC's patients are recovering from physical injuries that require orthopedic treatment.  Although a small number of UTC's patients have their treatment paid for by

private insurers, or by their employers through the Texas workers' compensation program, approximately 90% of patients have their services paid for by OWCP.

23.     UTC's President and Chief Executive Officer is Garry Craighead. Although he is a licensed chiropractor who calls himself "Roc Dok" and claims to be "the exclusive doctor to some of the most famous people in the world," Garry Craighead does not currently practice as a chiropractor.  He has a penchant for private planes, and enjoys boasting about hobnobbing with celebrities and making deals in back rooms – all of which can be read about through his Twitter account, @RocDok. Garry Craighead has had some success in ruining chiropractic practices in the past. Before operating UTC, he was the president and 100% shareholder of El Paso First Care Clinic, which he caused to file bankruptcy after routinely paying for his personal and familial expenses with clinic funds.  He has filed for personal bankruptcy twice and in both instances the cases were dismissed without a discharge.  In the more recent filing, in 2005, he was denied a discharge due to bankruptcy fraud and false statements in bankruptcy filings.

24.     William Sonia Jr. ("Sonia") is Garry Craighead's father-in-law, and is the owner and registered agent of the UTC limited liability companies.  On information and belief, the UTC companies were placed in Sonia's name to avoid Garry Craighead's creditors.  Sonia is ultimately responsible for all financial operations of UTC and is knowledgeable about all of the fraudulent activity alleged in this complaint.

25.     William Sonia III is Sonia's son, and is responsible for all financial operations of UTC, handling all of its money. Sonia III is also knowledgeable about all of the fraudulent activity alleged in this complaint.

26.     Christine Craighead is Garry Craighead's sister-in-law. Christine and her husband Larry Craighead (Garry's brother) formerly owned UTC; they sold it to Garry (through William Sonia) and moved to New Mexico. Eventually they tired of Mexico and moved back to the Austin area, and in the spring of 2008, Christine was hired by Garry to be UTC's Chief Operating Officer. From that point, all billing information from UTC centers was sent to Christine's private America Online email address, Neenie943@aol.com, and she was responsible for processing all billing information for FECA claims. Christine reviewed the superbills submitted from the centers, marked them up and then gave instructions to her staff as to how the claims should be entered it into the online claim processing and database program maintained by DFEC called ACS.

27.     UTC maintained uniform billing procedures for all of its centers. Each time a patient was seen by a UTC therapist, all services that were provided would be recorded in the patient's chart and treatment plan. These documents precisely record every specifc service provided. At the end of the session, the medical professional would also fill out a "superbill," a form which sets out all of the billing codes billed by UTC. The professional would circle the matching codes for the services provided, and where appropriate would indicate the units of service provided. The codes listed on superbills are standard Medicare CPT codes.

28.     The completed superbills were transmitted to the main office in Austin for processing.  Claims covered by FECA would be submitted to DFEC for OWCP reimbursement through ACS.  Once she joined UTC in early 2008, Christine Craighead was solely responsible for processing the superbills and having her staff submit the claims to DFEC through ACS.  UTC Medical personnel who provided services never saw the billing claims that were entered into ACS; similarly, billing personnel in the Austin office never saw the charts and treatment plans documenting the services actually provided that medical personnel created at the branch offices.  From early 2008 through the present, Christine Craighead ultimately decided what would be submitted to DFEC for OWCP reimbursement.

29.     Additional processes were required for new patients.  In those cases, an initial evaluation would be performed by the medical professional primarily responsible for treating the patient.  The professional would record and recommend a treatment plan.  When the patient's rehabilitation needs necessitated multiple treatments, the treatment plan and the services expected to be provided would have to be pre-certified.  For FECA claims, UTC was required to obtain prior approval for the proposed regimen of treatment, including a specified number of "units" for physical therapy, electrical stimulation, massage, ultrasound, or other active therapies.  In these cases, the proposed treatment plan would be forwarded to Christine Craighead who would apply to DFEC for approval through the ACS system.  As with standard billing claims, the therapists never saw the services for which Christine Craighead requested

pre-approval, but the charts and treatment plans documented what the UTC therapist thought was actually appropriate for the patient.

30.     Thus all UTC claims for OWCP reimbursement ran through Christine Craighead, who had unsupervised discretion to submit whatever she desired through ACS. This unreviewable authority was not an accident. Garry Craighead and Sonia deliberately instituted this system so UTC could systematically engage in upcoding — the intentional, improper submission of inflated billing codes for the purpose of receiving unearned reimbursement revenue. Christine Craighead submitted the inflated claims to DFEC with the knowledge and approval of all of the UTC principals. By systematically billing the United States for services UTC never delivered, the Rok Doc could support his extravagant life style without having to actually treat patients or be concerned that his clinic, like El Paso First Care, would collapse under the weight of his personal expenditures.

### D. The Fraudulent Conduct – Seven Upcoding Schemes

31.     Beginning no later than spring of 2008, when Christine Craighead moved to Austin and took a position with UTC, Defendants have intentionally and knowingly presented, or caused to be presented, false claims to the United States for payment for medical services. The claims were false because, among other reasons, the Defendants overcharged, upcoded, and billed for medical treatment, procedures, and services that were either not rendered or not medically necessary. Defendants defrauded the United States through no less than seven schemes.

32.     The First Scheme: inflating initial evaluations.  When clinics such as UTC treat a new patient, they are entitled to reimbursement for a new patient evaluation. The coding system employed for FECA claims, which is the same system used by Medicare, recognizes different levels of individual assessments, based on the length of time necessary to treat the patient and the intensity of service provided.  Most evaluations performed by chiropractic or rehabilitative clinics are properly coded as a "level 2" or "level 3" initial evaluation, under the codes 99202 or 99203.  Approximately 50% of all initial evaluations performed by UTC were coded as 99202 visits by UTC clinicians, and approximately 50% were coded as 99203 visits.   Less than one percent of all initial evaluations could properly be categorized as a "level 4" initial evaluation, with the code 99204.  That code is reserved for evaluations of an entire physiological system, such as a complete neurology or digestive system workup.  On information and belief, there were no initial evaluations conducted by UTC that merited a "level 5" designation under code 99205.

33.     When Christine Craighead received the superbills that evidenced new patient initial evaluations, she upcoded them as a matter of routine.  Where the evaluator had completed a superbill for a level 2 evaluation, code 99202, Christine Craighead inflated the coding to a 99203.  Similarly, when the evaluator had demarked a level 3 evaluation, code 99203, Christine inflated the code for the visit to 99204.  It also appears that she conjured some 99205 bills through upcoding.  OWCP paid the inflated initial evaluation claims submitted by UTC.

12

34.    The Second Scheme: precertification fraud.  After UTC clinicians performed an initial evaluation, UTC was required to obtain authorization from OWCP to administer additional treatment.  Certification requests contained recommended treatment plans which outlined the type and amounts of treatment the clinician believed the patient would need.  For example, clinicians would request authority to administer a certain number of "units" for active exercise, as well as "units" of other treatments, such as electrical stimulation, massages, chiropractic manipulation, or ultrasound.  As is customary in the industry, clinicians would request authorization for the maximum number of units that the patient was likely to need.  After reviewing the submissions, OWCP would either complete the requested authorization or reduce the amount of additional services to be provided.

35.    On behalf of UTC, however, Christine Craighead routinely inflated the number of units requested by UTC clinicians, and would even add requests for other types of treatment that the clinicians had not requested.  If the clinician requested authorization for three units of active exercise, for example, Christine Craighead might request authorization for five units, and sometimes added on requests for electrical stimulation or other types of treatments.  OWCP routinely approved the inflated treatment plans UTC requested.  Through this precertification fraud, UTC had the ability to bill for services that the patient did not require and that its clinicians never requested or performed.

36.    The Third Scheme: inflating follow-up office visits.  Once an initial office visit and evaluation were completed and billed with the 992-series CPT codes (99201-

99205), subsequent office visits would also be coded based on severity.  Most follow-up

visits were approximately fifteen minutes, and were considered "level three" and coded

99213 by UTC clinicians.  "Level four" visits, code 99214, were reserved for when the

clinician was examining multiple injured areas.  UTC clinicians coded approximately

80% of follow-up visits as 99213 on their superbills, while only approximately 20% of

follow-up visits were coded as 99214.  "Level five," or code 99215 visits, were never

generated by UTC clinicians.

37.     Christine Craighead, however, routinely inflated the codes for follow-up

visits performed by UTC clinicians.  99213 codes were inflated to 99214, while 99214

codes were inflated to 99215.

38.     <u>The Fourth Scheme: unwarranted addition of extended office visit codes.</u>

In addition to inflating initial office visit codes and follow-up visit codes, Christine

Craighead routinely added one of two "extended" office visit codes.  Without

justification, Christine Craighead would often add a 99354 code to office visits, which

was only permissible when a visit took approximately 90 minutes longer than expected.

Similarly, she would also sometimes include a 99358 code, which was for "prolonged

visits without client contact," reserved for extensive preparation or review for

clinicians.  On information and belief, UTC clinicians almost never recorded 99354 or

99358 codes on their superbills.

39.     The 99354 extended office visit code added an additional $250 of

reimbursement for office visit claims.  Code 99358 added $150 of reimbursement.  By

adding these codes to office visit codes that had already been fraudulently inflated,

14

Christine would significantly increase UTC's reimbursement for a single visit.  For example, level three follow-up visits entitled UTC to approximately $90 in reimbursement.  After receiving a superbill with such coding, Christine Craighead would upcode the visit to 99214, which resulted in $150 reimbursement, and routinely added 99354 (resulting in $300 total reimbursement) or 99358 ($400 total reimbursement), or sometimes both ($550 total reimbursement), fraudulently tripling, quadrupling or even quintupling UTC's reimbursement.

     40.    <u>The Fifth Scheme: upcoding treatment provided.</u>  In addition to meeting with patients for evaluation or follow-up office visits, UTC provided several types of therapies to its patients, including active exercise, electrical stimulation, massage, chiropractic manipulation or adjustments, or ultrasound treatments.  After an evaluation was completed and a battery of therapies was authorized by OWCP, UTC clinicians performed these therapies and circled the appropriate codes on superbills, noting that the therapy had been performed in patients' charts.

     41.    Claims for specific therapies provided to patients cannot be increased because the therapy was provided at a more intense level, but UTC could inflate its bills by claiming it had provided more units of treatment than were actually delivered.   For example, if a superbill reported that a UTC clinician had administered two units of active exercise, Christine Craighead would routinely bill for three or four units, despite the fact that only two units were delivered.  Similarly Christine and her staff would also bill for therapy services which did not appear on the superbills.  Thus, when a superbill

showed that a patient has only received active exercise and e-stim therapies, Christine and her staff would also bill for massage.

42.    UTC's overbilling for therapy services worked hand in glove with its pre-certification fraud.  UTC could add additional services to patients' bills because due to its fraudulent precertification requests, OTCW had approved services the patient never required and which the clinicians never planned to administer.  Part of Christine's job was to insure that all pre-certified services were billed, regardless of whether the services were actually delivered. The patients' superbills and treatment plans  (which remained in the clinical centers) truthfully record the actual services provided and prove that the bills Christine submitted to DFEC through the ACS system for OWCP reimbursement were false and fraudulent.

43.    The Sixth Scheme: billing for supplies not provided or needed.  From time to time, UTC clinicians would also provide supplies to its patients.  Christine Craighead routinely added codes for supplies that had not been provided.  A telling example is the alleged provision of vitamins, which OWCP reimbursed at a rate of $120.  Christine added codes for vitamins for many patients, but in reality they were almost never administered to patients.  In fact, the only UTC medical center that had the capability of administering vitamins was the Austin center; all claims for reimbursement for vitamins claimed to have been administered at other UTC medical centers are false claims.

44.    The Seventh Scheme: billing for surgical procedures not provided.  Garry Craighead also set up a company called "Creekside Surgical" that existed in a cubicle in

16

the Austin office.  Creekside did not actually perform any surgeries and the Austin administrative office was not an approved ambulatory surgical center, but Creekside billed for surgeries allegedly performed by current and former UTC or CCM&D employees.  On one occasion, a UTC patient came into the Austin office to inquire about an Explanation of Benefits form that had been provided to her by her private insurer. The insurer had reimbursed UTC or Creekside for a surgical procedure that the woman had never received.  On information and belief, Garry Craighead through Creekside Surgical billed several surgical procedures to the federal government that were never performed, often under the names of former employees of UTC or CCM&D.

### E.  How the Relator Learned of the Fraudulent Conduct

45.     The Relator worked in the Austin office, but did not have billing duties, instead handling administrative duties related to medical claims.  Although she was aware that service centers were required to send their billing information to Christine Craighead's personal email account, the Relator was compartmentalized from the billing manipulation scheme.  Late in the summer of 2011, however, events occurred that caused her to question UTC's billing practices, and she was able to prove the existence of fraud by the end of January 2012.

46.     In August 2011, UTC sent the Relator to Corpus Christi to fire a chiropractor who had been working at its treatment center there.  For two weeks the Relator worked as a chiropractor at the Corpus Christi center until a replacement chiropractor was hired.  During this period she treated approximately 20 patients.

47.     Shortly after she returned from Corpus Christi to UTC's Austin office, the Relator learned that a podiatrist working at one of UTC's service centers, Dr. Cannalis, had expressed displeasure about how his work was being billed.  Upon information and belief, Dr. Cannalis was compensated by receiving a percentage of the billings he generated at UTC.  After Dr. Cannalis asked to see a print out of his billings, he complained to the office manager that he had never submitted bills for many of the services attributed to him.  Dr. Cannalis left the practice very shortly after this incident.

48.     Also around this time, late August or early September 2011, a patient asked the Relator to explain an Explanation of Benefits ("EOB") notice that she had received from her insurer.  The EOB indicated that UTC was being compensated for a surgical procedure it performed on the patient.  But the patient told the Relator she had never undergone the surgical procedure identified in the EOB.  The Relator attempted to investigate this bill, but Christine Craighead and others at the Austin office were uncooperative.  Subsequently, the Relator realized that UTC had never performed the procedure in question, but had billed the insurer consistent with the numerous billing frauds UTC routinely conducted that have been described above.

49.     In or about September 2011, the Relator's co-worker, Tamie Granger, was experiencing discomfort in her foot and asked a UTC physician employed in the  Austin medical center to examine her.  Tamie and the Relator later checked up on how this procedure had been billed to Tamie's private insurer.  Ms. Granger received an EOB, which she showed to the Relator, that indicated that UTC had been reimbursed for a level four initial visit, code 99204.  Both Ms. Granger and the Relator knew that the brief

office visit should have been billed as a level one visit with the 99201 code. Moreover, the EOB also stated that Ms. Granger's insurer had been billed for a procedure that had never been performed. At this point, the Relator realized that there were problems in UTC's billing system, but she was unaware of the extent of the problems or that the upcoding was deliberate.

50.     In October 2011, to determine the extent of the billing improprieties, the Relator logged on to ACS and examined UTC's billing for the twenty patients she saw when she treated patients in Corpus Christi two months earlier. She compared the services she personally provided to FECA patients to the services OWCP paid for according to relevant ACS records. She found that UTC had upcoded services provided to each and every patient she saw in Corpus Christi, and for each of these patients UTC had collected reimbursement from the United States for medical services UTC had never provided.

51.     The Relator confirmed that UTC was deliberately engaged in widespread fraud in January 2012. Christine Craighead sent the Relator back to the Corpus Christi center to determine why that center's profits were lower than that of other locations. At Corpus Christi, the Relator had access to all of the center's patients' treatment plans, superbills, and ACS billing. The Relator did a random sampling of approximately 30 patient charts. In those examples, the information on superbills was consistent with the expected treatment as outlined on treatment plans. Nonetheless, once the Relator checked the ACS billing database, she found that all of the procedures had been reimbursed at a higher rate, with codes that had not been identified on superbills. In all

19

of the examples in her sampling, UTC had upcoded for services provided to each and every patient.

52.     In performing this chart audit in January 2012, the Relator made copies of her sample superbills, treatment plans, and ACS billing information, to bring back to the home office in Austin.

53.     On January 30, 2012, the Relator and her colleague Tamie Granger were called into a conference room with the other administrative personnel at UTC's Austin office.  Garry Craighead gave a long speech to the UTC employees there before firing the Relator and Tamie Granger.

54.     Later on January 30, 2012, the Relator took all of the superbill copies and ACS billing documents she had custody of, and gave them to the FBI.  She did not retain copies of any of these documents.

55.     On several occasions thereafter, the Relator has been interviewed about UTC's fraudulent practices by the Federal Bureau of Investigation and persons from the Inspector General offices of several government agencies.  On these occasions, the Relator provided all information she could provide to the Government, including how each office coded superbills, how they were faxed or emailed to Christine Craighead, the billing manipulation Christine performed, and how the manipulated billing information was entered into ACS and eventually billed.

56.     The Relator witnessed one other incident that does not implicate upcoding directly but was an illegal act by UTC that defrauded the United States for the purpose of increasing billings.  UTC retained marketing consultants to help them obtain referrals

from postal unions and other unionized federal workers.  In late summer 2010, one of these marketers, Richard Arriola, showed the Relator an envelope filled with cash. Arriola told the Relator that $2,000 was in the envelope, and that Garry Craighead had given him the money with the express instruction to give it one of the representatives of a federal workers' union as a "donation" when the representative visited UTC's main office in Austin.  This payment was an illegal kickback meant to induce the union representative to steer his union's members to UTC for FECA-eligible medical services. On information and belief, this practice of paying kickbacks to union representatives to induce them to direct injured workers to UTC for treatment was frequent.  It is also illegal.

## COUNT I
## VIOLATING FALSE CLAIMS ACT BY MAKING FALSE CLAIMS FOR PAYMENT BY IMPROPERLY UPCODING FOR MEDICAL SERVICES
### 31 U.S.C. § 3729(a)(1)(A)

57.     The Relator repeats and realleges each and every allegation in the paragraphs above as if fully set forth herein.

58.     By reason of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States for payment or approval.

59.     UTC set out on a deliberate campaign to fraudulently obtain falsely inflated payments from the Government.  The false claims submitted by UTC, through Christine Craighead, by Garry Craighead's direction and with William Sonia's approval, helped the company to post a 1900% increase in billing within a two year period.

21

60.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

61.     By reason of the above-described actions and the presentment of false or fraudulent claims, the United States has suffered significant losses in an amount to be determined.

## COUNT II
## VIOLATING FALSE CLAIMS ACT BY MAKING, USING, OR CAUSING TO BE MADE OR USED FALSE RECORDS OR STATEMENTS TO INDUCE REIMBURSEMENT FOR FALSE CLAIMS
31 U.S.C. § 3729(a)(1)(A)

62.     The Relator repeats and realleges each and every allegation in the paragraphs above as if fully set forth herein.

63.     By reason of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to induce the United States to approve and pay such false or fraudulent claims.

64.     As part of a systematic strategy to inflate and exaggerate all its billings under the FECA program, UTC tasked Christine Craighead with creating false records for the purpose of obtaining payment for false and fraudulent claims.  Christine Craighead knowingly created false records of the medical services UTC provided to patients covered by FECA and then submitted those false records to UTC's billing database, known as ACS.  The false billing records in ACS contributed directly to the false claims submitted to the Government on UTC's behalf.  As a result of Christine's making and use of false records, the United States paid millions of dollars of false

claims to UTC. Because Christine was acting pursuant to the instructions and knowledge of Craighead and Sonia, Craighead and Sonia caused the false records to be made and used.

65.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

66.     By reason of the above-described actions and the presentment of false or fraudulent claims, the United States has suffered significant losses in an amount to be determined.

## COUNT III
## CONSPIRING TO VIOLATE THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(C)

67.     The Relator repeats and realleges each and every allegation in the paragraphs above as if fully set forth herein.

68.     With the approval of William Sonia, Garry Craighead set out to increase UTC's profits, in which he personally shared, by knowingly and deliberately submitting false claims for payment to the Government. To accomplish this fraudulent goal, Garry Craighead recruited Christine Craighead, who took on most of the direct conduct in perpetration of the fraudulent scheme. This cooperation, taken in concert, violated the False Claims Act, and the Defendants have conspired to violate 31 U.S.C. § 3729(a)(1)(C).

69.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

70.    By reason of the above-described actions and the presentment of false or fraudulent claims, the United States has suffered significant losses in an amount to be determined.

## COUNT IV
## VIOLATING THE FALSE CLAIMS ACT BY PAYING KICKBACKS
31 U.S.C. § 3729(a)(1)(A)
42 U.S.C. § 1320a-7b

71.    The Relator repeats and realleges each and every allegation in the paragraphs above as if fully set forth herein.

72.    With the approval of William Sonia, Garry Craighead attempted to increase UTC's total number of patients through the illegal payment of kickbacks to representatives of federal workers' organizations.  These ill-gotten patients were covered by FECA, and when UTC submitted claims for reimbursement to OWCP for patients it had gained through its kickback activities, it was submitting false claims for payment to OWCP.

73.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

74.    By reason of the above-described actions and the presentment of false or fraudulent claims, the United States has suffered significant losses in an amount to be determined.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of the United States of America, requests that this Court:

(a) Enter judgment holding Union Treatment Centers, William Sonia, Garry Craighead, and Christine Craighead liable for a civil penalty of $11,000 for each violation of the False Claims Act committed by them;

(b) Enter judgment holding Union Treatment Centers, William Sonia, Garry Craighead, and Christine Craighead liable for three times the amount of damages sustained by the United States because of its acts;

(c) Award the Relator a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

(d) Award the Relator his costs and reasonable attorneys' fees for prosecuting this action; and

(e) Enter such other relief which the Court finds just and equitable.

Respectfully submitted,

**LISA WHEELER, on behalf of the United States of America,**

By her attorneys,

Dated: January 2, 2013

/s/ John P. Cowart
John P. Cowart, TBA 04919500
jcowart@moorelandrey.com
Moore Landrey, LLP
1609 Shoal Creek Blvd., Ste. 100
Austin, TX  78701
(512) 499-8900 / Telephone
(512) 320-8906 / Facsimile

and

Thomas M. Greene, Esq. Mass. BBO# 210020
tgreene@greenellp.com
Michael Tabb, Esq. Mass. BBO# 491310
matabb@greenellp.com
Ryan P. Morrison, Esq. Mass. BBO# 680238
rmorrison@greenellp.com
**GREENE**LLP
One Liberty Square, Suite 1200
Boston, MA 02109
(617)  261-0040