FILED

JUN 2 3 2015

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. Lisa Wheeler,<br><br>Plaintiff,<br><br>v.<br><br>UNION TREATMENT CENTERS, LLC;<br>UNION TREATMENT CENTER – AUSTIN,<br>LLC; UNION TREATMENT CENTER –<br>KILLEEN, LLC; UNION TREATMENT<br>CENTER – SAN ANTONIO, LLC; UNION<br>TREATMENT CENTER – CORPUS<br>CHRISTI, LLC; UTC MANAGEMENT, LLC;<br>UTC PROVIDERS – AUSTIN, INC.; UTC<br>UTC PROVIDERS – KILLEEN, INC.; UTC<br>UTC PROVIDERS – SAN ANTONIO, INC.;<br>UTC PROVIDERS – CORPUS CHRISTI,<br>INC.; CREEKSIDE SURGICAL, PLLC;<br>CREEKSIDE DIAGNOSTICS, LLC; CCM&D<br>CONSULTING, LLC; GARRY CRAIGHEAD;<br>CHRISTINE CRAIGHEAD,<br><br>Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § §   Civ. A. No. SA:13-cv-4-HLH |

## UNITED STATES OF AMERICA'S COMPLAINT IN INTERVENTION

1.      Defendants submitted, and caused and conspired with others to submit, false claims to the federal workers' compensation program ("FECA program") administered by the United States Department of Labor ("DOL") pursuant to the Federal Employees' Compensation Act, 5 U.S.C. §§ 8101 to 8152 ("FECA").

2.      The United States brings this action for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729 to 3733, to hold defendants accountable for their misconduct. Alternatively, the United States asserts common law and equitable claims to recover payments that defendants were not entitled to receive.

## I.   NATURE OF ACTION

3.   This is a civil health care fraud action.

4.   Between January 1, 2009 and December 31, 2013, defendants perpetrated a scheme to overcharge the DOL for services and supplies they allegedly rendered to patients covered by the FECA program.  Defendants billed the DOL for services they did not provide; upcoded their claims; inflated the time patients spent in treatment; and charged for unnecessary and ineligible services and supplies.

5.   In addition to overbilling the DOL, defendants executed kickback schemes to maximize their revenue in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). Defendants solicited and received kickbacks from third party providers in exchange for patient referrals; and they offered and paid kickbacks to ensure patient flow.

6.   By engaging in these schemes, defendants knowingly submitted, and caused and conspired with others to submit, thousands of false claims for payment to the DOL in violation of the False Claims Act, 31 U.S.C. § 3729(a).

7.   The DOL paid defendants, and others acting in concert with them, millions of dollars on these false claims to the detriment of the FECA program and the federal agencies and instrumentalities that support it.

## II.   JURISDICTION AND VENUE

8.   The United States brings this action under the False Claims Act and under common law and equitable theories of payment by mistake, unjust enrichment, recoupment, and conversion.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1367(a) and 31 U.S.C. § 3730(a).

9.     The Court may exercise personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) because defendants reside, can be found, and transact business in the Western District of Texas, and because they committed acts in this district that violated 31 U.S.C. § 3729.

10.     This judicial district is a proper venue under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because defendants reside, can be found, and transact business in the Western District of Texas, and because a substantial part of the acts giving rise to the United States' claims occurred in this district.

## III.   PARTIES

11.     The United States is the plaintiff in this case.  The DOL is an agency of the United States government.  The DOL administers the FECA program on behalf of other federal agencies and instrumentalities – including the United States Postal Service ("USPS") and United States Army – which ultimately bear the cost of the program.

12.     Relator Lisa Wheeler ("relator") is an individual residing in Round Rock, Texas. She is a licensed chiropractor and formerly worked for defendant Union Treatment Center, LLC as an employee, health care provider, and manager.  Relator initiated this action on or about January 3, 2013, by filing a Complaint pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730(b).  The United States has intervened and assumed control of relator's action under 31 U.S.C. § 3730(b)(4), and files this superseding Complaint in Intervention.

13.     Defendant Garry Craighead is an individual residing in Leander, Texas.  He is a licensed chiropractor.  Garry Craighead devised the health care fraud scheme at issue.

14.     Defendant Christine Craighead is an individual residing in the Austin, Texas area. She is Garry Craighead's sister-in-law.  Christine Craighead helped Garry Craighead carry out

3

the health care fraud scheme at issue and is responsible for submitting and causing others to submit thousands of false claims to the DOL.

15.     Defendant Union Treatment Centers, LLC ("UTC") was a limited liability company located at 8900 Shoal Creek Boulevard, Austin TX 78757.  UTC operated medical and rehabilitation clinics in Austin, Killeen, San Antonio, and Corpus Christi.  At all relevant times, UTC and its clinics maintained a registered office and transacted business in this district.

16.     Garry Craighead founded UTC and was the company's Chief Executive Officer ("CEO") from 2007 through early 2014.

17.     Christine Craighead was UTC's Chief Operating Officer ("COO") from 2007 through early 2014.

18.     William Sonia was UTC's majority owner and is Garry Craighead's father-in-law.

19.     UTC effectively ceased operating in mid-2014 and became defendant UTC Management, LLC, a limited liability company that does business as UTC Health & Rehab ("UTCH").  William Sonia formed UTCH after he learned that UTC was under investigation for defrauding the DOL.  UTCH and UTC are, in substance, the same company.  UTCH is headquartered at the same Austin location; operates clinics in the same cities; occupies the same offices; uses the same equipment; conducts the same business; provides the same services; is owned by the same people; has the same registered agent; and has many of the same patients, employees, health care providers, managers and executives as its predecessor UTC.  UTCH and its clinics are therefore liable to the United States as UTC's successor or alter ego.

20.     Defendant Union Treatment Center – Austin, LLC ("UTC-Austin") was UTC's Austin clinic located at 8900 Shoal Creek Boulevard, Austin TX 78757.  UTC-Austin was a

limited liability company that functioned as an agent or instrumentality of UTC.  At all relevant times, UTC-Austin maintained a registered office and transacted business in this district.

21.     UTC-Austin effectively ceased operating in mid-2014 and became UTC Providers – Austin, Inc., a corporation that does business as UTC Health & Rehab – Austin ("UTCH-Austin").  UTCH-Austin and UTC-Austin are, in substance, the same clinic.  UTCH-Austin is therefore liable to the United States as UTC-Austin's successor or alter ego.

22.     Defendant Union Treatment Center – Killeen, LLC ("UTC-Killeen") was UTC's Killeen clinic located at 3106 South W.S. Young, Killeen, TX 76542.  In 2013, the UTC-Killeen clinic relocated to 2206 E. Central Expressway, Killeen TX 76543.  UTC-Killeen was a limited liability company that functioned as an agent or instrumentality of UTC.  At all relevant times, UTC-Killeen maintained a registered office and transacted business in this district.

23.     UTC-Killeen effectively ceased operating in mid-2014 and became UTC Providers – Killeen, Inc., a corporation that does business as UTC Health & Rehab – Killeen ("UTCH-Killeen").  UTCH-Killeen and UTC-Killeen are, in substance, the same clinic.  UTCH-Killeen is therefore liable to the United States as UTC-Killeen's successor or alter ego.

24.     Defendant Union Treatment Center – San Antonio, LLC ("UTC-San Antonio") was UTC's San Antonio clinic located at 200 E. Ramsey Road, San Antonio, TX 78216.  UTC-San Antonio was a limited liability company that functioned as an agent or instrumentality of UTC.  At all relevant times, UTC-San Antonio maintained a registered office and transacted business in this district.

25.     UTC-San Antonio effectively ceased operating in mid-2014 and became UTC Providers – San Antonio, Inc., a corporation that does business as UTC Health & Rehab – San Antonio ("UTCH-San Antonio").  UTCH-San Antonio and UTC-San Antonio are, in substance,

the same clinic.  UTCH-San Antonio is therefore liable to the United States as UTC San-Antonio's successor or alter ego.

26.     Defendant Union Treatment Center – Corpus Christi, LLC ("UTC-Corpus Christi") was UTC's Corpus Christi clinic located at 151 South Staples Street, Corpus Christi, TX 78404.  UTC-Corpus Christi was a limited liability company that functioned as an agent or instrumentality of UTC.  At all relevant times, UTC-Corpus Christi maintained a registered office and transacted business in this district.

27.     UTC-Corpus Christi effectively ceased operating in mid-2014 and became UTC Providers – Corpus Christi, Inc., a corporation that does business as UTC Health & Rehab – Corpus Christi ("UTCH-Corpus Christi").  UTCH-Corpus Christi and UTC-Corpus Christi are, in substance, the same clinic.  UTCH-Corpus Christi is therefore liable to the United States as UTC-Corpus Christi's successor or alter ego.

28.     Defendant Creekside Diagnostics, LLC ("Creekside Diagnostics") was a limited liability company engaged in the practice of medicine.  Thomas Martens, D.O. formed Creekside Diagnostics on or about March 2, 2011.  At all relevant times, Creekside Diagnostics maintained a registered office and transacted business in this district.  Creekside Diagnostics forfeited its charter in 2013, but continued operating at all times relevant to this action.

29.     Defendant Creekside Surgical, PLLC ("Creekside Surgical") was a professional limited liability company engaged in the practice of medicine.  Thomas Martens, D.O. formed Creekside Surgical on or about March 15, 2011.  At all relevant times, Creekside Surgical maintained a registered office and transacted business in this district.  Creekside Surgical forfeited its charter in 2013, but continued operating at all times relevant to this action.

30.     Thomas Martens, D.O. was a proxy for Garry Craighead.  Dr. Martens formed Creekside Diagnostics and Creekside Surgical (together, "the Creekside companies") and put the companies in his name at Garry Craighead's request and direction because Texas law prohibited Craighead, a non-physician, from owning, controlling, and profiting from companies that employed physicians engaged in the practice of medicine.

31.     Garry Craighead was the de facto owner and CEO of the Creekside companies. He controlled their operations; dominated their finances; and possessed and restricted access to their business records.[1]

32.     Christine Craighead was COO of the Creekside companies.

33.     Defendant CCM&D Consulting, LLC ("CCM&D") was a limited liability company.  At all relevant times, CCM&D maintained a registered office and transacted business in this district.  CCM&D forfeited its charter in 2010, but continued operating at all times relevant to this action.

34.     Garry Craighead owned and was the President and CEO of CCM&D.[2]

35.     Christine Craighead was COO of CCM&D.

## IV.   LEGAL FRAMEWORK

### A. The FECA Program

36.     The FECA program provides workers' compensation benefits to civilian employees of the United States government who suffer job-related injuries.  5 U.S.C. §§ 8101 to 8152; 20 C.F.R. § 10.0.  The program covers roughly three million federal workers, including USPS employees.  5 U.S.C. § 8101(1); 39 U.S.C. § 1005(c); 20 C.F.R. § 10.5(h).

---

[1] See United States v. Creekside Surgical, PLLC (d/b/a Creekside Surgical, LLC) and Creekside Diagnostics, LLC, no. SA:14-MC-0698-DAE (W.D. Tex.) (Dkt. ##1, 2, 3, 7.)

[2] See United States v. CCM&D Consulting, LLC, no. SA:14-MC-0583-DAE (W.D. Tex.) (Dkt. ##1, 5, 11.)

37.     FECA benefits include coverage of an injured worker's medical and rehabilitation expenses. 5 U.S.C. §§ 8102, 8103; 20 C.F.R. §§ 10.0(b), 10.310.

38.     The DOL, through its Office of Workers' Compensation Programs ("OWCP"), administers the FECA program and uses federal funds to pay doctors, physical therapists, and other enrolled providers for treating covered workers. 5 U.S.C. § 8147(a); 20 C.F.R. § 10.1. Although the DOL initially pays the providers for their services, the ultimate cost of the FECA program is borne by the federal agencies and instrumentalities that employ the covered workers ("employing agencies"). Through a "chargeback" process, the DOL bills the employing agencies for the services, supplies, and other benefits provided to their personnel. The employing agencies reimburse the DOL for the cost of these benefits. 5 U.S.C. § 8147(b).

39.     Postal workers comprise the largest group of beneficiaries covered by FECA and, consequently, the USPS typically incurs the most annual FECA expenses of all employing agencies. The USPS reimburses the DOL for the benefits provided to postal workers, and must pay the DOL a fee for administering the FECA program. 5 U.S.C. § 8147(c). The amount of the administrative fee – called the "fair share" – is tied to the amount of benefits expended on USPS employees during the chargeback period. Because the fair share is calculated as a percentage of benefits, FECA fraud has a double impact on the USPS. Fraudulent claims increase the cost of the benefits that the USPS must repay to the DOL, which in turn inflates the fair share the USPS must pay the DOL to administer the FECA program for postal workers.

40.     To become eligible to bill the DOL for treating federal workers, a health care provider must first enroll with OWCP. To enroll with OWCP, a provider must complete and submit a form to ACS, the DOL's claims processing contractor. 20 C.F.R. § 10.800(a). Upon verifying that the form is complete, and that the applicant has not been excluded from other

federal health care programs, ACS issues the applicant a provider number.  Once the applicant receives a provider number from ACS, the provider can begin billing the DOL.

41.     Billing can be done electronically or by mail.  A provider that chooses to bill electronically can submit claims for payment to the DOL through an online billing system maintained by ACS.  20 C.F.R. § 10.800(c).  The claim must be submitted on OWCP Form 1500, or a comparable form used by Medicare and other federal programs.  20 C.F.R. § 10.801(a).  Each claim submitted to the DOL must state the patient's diagnosis and itemize the services and supplies rendered to the patient.  20 C.F.R. § 10.801(b)-(e).  The services and supplies are typically identified by codes called "CPT codes."

42.     The American Medical Association ("AMA") publishes numeric codes known as Current Procedural Terminology or CPT codes.  CPT codes are five-digit numbers the AMA assigns to the services performed by health care providers.  The codes establish a uniform way of referring to common procedures.  They are routinely used in health care billing.  When a provider submits a claim to the FECA program, the provider must list the correct CPT code for each service performed.  20 C.F.R. § 10.801(c).  Each CPT code has an associated fee, which dictates how much the DOL will reimburse the provider.  The DOL calculates the fee by using a formula that takes into account the CPT code and the location where the service was performed.

43.     When billing the FECA program, a provider must certify that the services and supplies reflected on the claim form were medically indicated, necessary for the health of the patient, and actually furnished.  20 C.F.R. § 10.801(d).  The DOL relies on the accuracy of the information, CPT codes, and certifications reflected on the claim form to determine whether the provider's services are reimbursable and the amount of reimbursement the provider is due.   The

claim form specifically warns the billing provider of the consequences of submitting false claims and making false statements to the DOL.

44.     To qualify for reimbursement under FECA, a provider's services must be (1) prescribed or recommended by a qualified physician, 20 C.F.R. § 10.310(a); (2) properly documented, 20 C.F.R. §§ 10.800(a), 10.801(a); and (3) medically necessary to treat the work-related injury, 20 C.F.R. §§ 10.310 (a), 10.801(d).

45.     Compliance with the FECA program's rules is a condition of payment.  DOL's regulations specifically state that:

> [b]y submitting a bill and/or accepting payment, the provider signifies that the service for which reimbursement is sought was performed as described, necessary, appropriate and properly billed in accordance with accepted industry standards. . . In addition, the provider thereby agrees to comply with all regulations set forth in this subpart concerning the rendering of treatment and/or the process for seeking reimbursement for medical services, including the limitation imposed on the amount to be paid for such services.

20 C.F.R. § 10.801(d).

## B.  The False Claims Act

46.     The False Claims Act prohibits the submission of false claims, statements, and records to federal health care programs, like FECA.

47.     The statute provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of [the statute];

* * *

is liable to the United States Government for a civil penalty . . .
plus 3 times the amount of damages which the Government
sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(A)-(C).

48.     The False Claims Act defines the terms "knowing" and "knowingly" as follows:

(1) the terms "knowing" and "knowingly" –

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the
information; or

(iii) acts in reckless disregard of the truth or falsity of the
information;

(B) require no proof of specific intent to defraud;

31 U.S.C. § 3729(b)(1).

49.     The False Claims Act defines the term "claim" as:

any request or demand, whether under a contract or otherwise, for
money or property and whether or not the United States has title to
the money or property, that -- (i) is presented to an officer,
employee, or agent of the United States; or (ii) is made to a
contractor, grantee, or other recipient, if the money or property is
to be spent or used on the Government's behalf or to advance a
Government program or interest, and if the United States
Government – (I) provides or has provided any portion of the
money or property requested or demanded; or (II) will reimburse
such contractor, grantee, or other recipient for any portion of the
money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2).

50.     A request for payment submitted to the FECA program, through the online ACS

system or otherwise, is a claim under the False Claims Act.

51.     The civil penalty for violating the False Claims Act is $5,500 to $11,000 per violation.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(9).

**C. The Anti-Kickback Statute**

52.     The Anti-Kickback Statute makes it a crime to pay or receive compensation in exchange for or to induce the referral of patients covered by a federal health care program.

53.     The Statute provides in pertinent part as follows:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program  . . .
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . .
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b) (emphasis added).

54.     Actual knowledge or specific intent to violate the Anti-Kickback Statute is not required.  42 U.S.C. § 1320a-7b(h).

55.     The Anti-Kickback Statute applies to all "federal health care programs," defined as "any plan or program that provides health benefits, whether directly, through insurance, or

otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of Title 5)."  42 U.S.C. § 1320a-7b(f).

56.    The FECA program is a federal health care program under and subject to the Anti-Kickback Statute.

57.    A claim for payment submitted to a federal health care program that results from, or is tainted by, a kickback is a false claim and subjects the billing provider to liability for treble damages and civil penalties under the False Claims Act.  42 U.S.C. § 1320a-7b(g).

## V.    FACTS

### A.  Defendants and Their Companies

58.    Garry Craighead and Christine Craighead controlled and operated a group of health care companies that did business under the name Union Treatment Center, including:  (a) UTC, which operated medical and rehabilitation clinics; (b) the Creekside companies, which provided diagnostic and surgical services to UTC patients; and (c) CCM&D, which provided marketing and management services to the group.

59.    Garry Craighead and Christine Craighead ran these companies from their corporate headquarters located in Austin at 8900 Shoal Creek Boulevard, Austin TX 78757.

### *UTC and its clinics*

60.    Garry Craighead formed UTC on February 23, 2007, and was the company's CEO through early 2014.

61.    Garry Craighead installed his sister-in-law, Christine Craighead, as COO and gave her control of the UTC's day-to-day operations.  She ran UTC's corporate headquarters and billing department in Austin.  The managers of UTC's clinics reported to Christine Craighead. Christine Craighead left UTC in early 2014.

13

62.     On or about May 15, 2008, Garry Craighead transferred ownership of UTC to his father-in-law, William Sonia.[3] Sonia became the company's sole managing member, majority owner and primary financial backer.

63.     Despite the change in ownership, Garry and Christine Craighead remained in full operational control of UTC. Together they established UTC's policies and procedures; oversaw and directed the company's clinics; controlled billing; determined what business expenses would get paid; selected and paid the company's health care providers; dictated the hospitals to which patients would be referred for surgery; chose the pharmacies that would fill patient prescriptions; and marketed UTC's services to federal employee unions and other referral sources.

64.     UTC's clinics focused on treating patients who had suffered workplace injuries and whose claims were covered by FECA. Most of UTC's patients were U.S. postal workers.

65.     UTC employed or contracted with doctors, chiropractors, and other providers who offered a range of services, including initial and follow-up medical examinations; physical therapy; case management; and related medical supplies.

66.     When it began operating in 2007, UTC had one clinic Austin. By 2011, the company had grown to include facilities in Killeen, San Antonio, and Corpus Christi.

67.     At all relevant times, UTC's clinics were enrolled providers in the FECA program. Each clinic had its own provider number under which defendants billed the DOL for services and supplies provided to FECA patients.

---

[3]The transfer occurred after the Texas Department of Insurance ("TDI") excluded Garry Craighead from the state workers' compensation program. TDI regulates the state workers' compensation system under the Texas Workers' Compensation Act. Like FECA, the state's program covers the medical expenses of workers who suffer job-related injuries. Unlike FECA, however, state coverage is furnished by private insurance carriers. TDI excluded Craighead from the state program based on a medical review that found he had engaged in excessive billing and harmed his patients. The TDI exclusion barred Craighead from treating state patients and from receiving compensation from entities, like UTC, that treated state patients. (Ex. #1.)

68.    In October, 2011, Garry Craighead purchased clinics located in Dallas and Fort Worth from a company called New Help Clinics, P.A. ("New Help clinics").

69.    The New Help clinics became the Dallas and Fort Worth locations of UTC.  UTC employees performed billing, scheduling, case management, and other administrative functions for these facilities.

70.    At all relevant times, the Dallas and Fort Worth clinics were enrolled providers in the FECA program.  Each clinic had its own provider number under which defendants billed the DOL for services and supplies provided to FECA patients

### *The Creekside companies*

71.    Garry Craighead caused the Creekside companies to be formed in March, 2011.

72.    Creekside Surgical was a surgical practice that hired contract physicians to treat UTC patients who had been referred for surgical consults and procedures.

73.    Creekside Diagnostics was a diagnostic practice.  It hired physicians to examine UTC patients who had been referred for testing.

74.    At all relevant times, the Creekside companies were enrolled providers in the FECA program.  Each company had its own provider number under which defendants billed the DOL for services and supplies provided to FECA patients

75.    The Creekside Companies operated out of UTC's clinics and saw UTC patients.

76.    UTC employees performed billing, scheduling, case management, and other administrative functions for the Creekside companies.

77.    The Creekside companies had no offices, equipment, staff, or patients of their own outside of UTC.

78.     Garry Craighead and Christine Craighead required and directed the UTC clinics and providers to refer their patients to the Creekside companies for services.

79.     The Creekside companies were the mandatory surgical and diagnostic providers for UTC patients.

80.     The Creekside companies gave the defendants the ability to perform and bill for diagnostic and surgical procedures, which otherwise would have been referred to third-party health care providers.

81.     Between March 1, 2011 and December 31, 2013, the DOL paid the Creekside companies over $3 million for services and supplies rendered to UTC patients covered by FECA.

82.     Between March 1, 2011 and December 31, 2013, Garry Craighead transferred over $2 million from the Creekside companies' bank accounts to CCM&D.

### *CCM&D*

83.     CCM&D was a health care consulting firm owned by Garry Craighead.

84.     CCM&D marketed the defendants' services to employee unions and negotiated patient referral arrangements with third party health care providers.

85.     Garry Craighead used CCM&D to pay personal expenses and to solicit, receive, offer, and pay remuneration to third parties in exchange for and to induce patient referrals.

### *Defendants' business model*

86.     UTC, the Creekside companies, and CCM&D appeared, at least on paper, to be unrelated companies owned and managed by a tangle of disparate individuals and entities.  In reality, Garry Craighead and Christine Craighead ran these companies together and coordinated their operations to exploit the FECA program.  The following chart depicts the reporting structure of defendants' businesses in substance:

16



87.     Defendants' business model worked as follows:  (a) CCM&D marketed

defendants' services to federal employee unions, which steered their members to UTC's clinics;

(b) UTC's clinics evaluated patients and initiated treatment and physical therapy; (c) UTC's

clinics referred patients to the Creekside companies for testing, evaluation, and surgery; and (d)

the Creekside companies referred patients back to UTC's clinics for more physical therapy and

follow-up care.  The cycle then repeated itself, for both new and established patients.

88.     By working in unison, the defendants were able to capture and control the entire

course of a patient's care, which allowed them to bill the FECA program for services and

supplies at each step of the process and to maximize their per patient revenue.

89.     Defendants unlawfully enhanced their revenue by engaging in overbilling and

kickback schemes.  As a result of these schemes, the defendants were among the most prolific

billers in the FECA program.

90.     From January 1, 2009 to December 31, 2013, for example, UTC's clinics in

Austin, Killeen, San Antonio, and Corpus Christi billed the DOL over $56 million for the

services and supplies they allegedly provided to FECA patients.  The DOL paid defendants

nearly $43 million for the services and supplies rendered at just these four locations.

**B. The Billing Scheme**

91.      Between January 1, 2009 and December 31, 2013, defendants knowingly

overcharged the DOL for services and supplies rendered to FECA patients.

92.      Garry Craighead and Christine Craighead structured defendants' billing process to

facilitate the submission of false claims to the DOL.

93.      Defendants maintained a central billing department in their Austin headquarters,

which handled the billing for the UTC clinics and the Creekside companies.

94.      Christine Craighead ran the billing department.  Billing information flowed to and

from her, or someone acting under her supervision and control.  She was the bridge between the

clinics – where services were rendered – to the billing clerks – who submitted claims to DOL

through the online ACS system.

95.      By centralizing the billing in Austin, and funneling the process through Christine

Craighead, defendants kept the clinical and billing departments compartmentalized, ensuring that

few people other than Garry Craighead, Christine Craighead and her immediate subordinates

knew the full extent of defendants' pattern of false billing.

96.      Christine Craighead had virtually unfettered authority over the billing department.

She answered only to Garry Craighead.  Defendants had no Compliance Department or

Compliance Officer to monitor her conduct.  The absence of meaningful corporate governance

and oversight allowed Christine Craighead to function without constraint.

97.      Garry Craighead placed Christine Craighead in charge of billing even though she

had no medical billing or coding training or credentials and was not a licensed or certified health

care provider.  Despite the absence of such experience, Christine Craighead routinely made medical billing and coding decisions.

98.     The billing process began in the clinics, where UTC and Creekside doctors, chiropractors and other providers saw patients and documented the services they rendered on a form known as a "superbill."

99.     A superbill is a form used to collect information about patient encounters.  Each superbill is tailored to the provider's specialty (e.g., a podiatrist's superbill will differ from a cardiologist's superbill).  The superbill lists the diagnoses, services, and corresponding codes that the provider commonly uses.  Each time a patient is examined, the provider annotates a superbill to document the encounter, the patient's diagnosis, and the services that were performed.  The information and codes marked on the superbill are then used to bill the patient, private insurance, or government health care program.

100.     At the end of each day, the UTC clinics compiled their billing records, which typically consisted of the schedule of patients for that day; the sign-in sheet listing the patients that came in to the clinic; and a completed superbill for each patient.

101.     The clinics forwarded their records to Austin, where they were collected and provided to Christine Craighead.

102.     The superbills were typically faxed or emailed.  They were often blank and frequently lacked essential information, such as the date of service.

103.     Christine Craighead then "audited" the superbills – a euphemism for reviewing and altering the records to increase the amount defendants could bill.

104.     Christine Craighead reviewed and altered the superbills weekly.

105.    During her weekly reviews, Christine Craighead added charges for services and supplies that defendants had not provided; upgraded defendants' claims by billing for more complex and costly services than were actually rendered; inflated the time patients spent in treatment; and billed for services and supplies that were not necessary or eligible for reimbursement.

106.    The altered superbills showed signs of manipulation:  original clinical notations were scratched out or written over; new codes were circled or written in by hand; the number of "units" of a service rendered were changed; new service and supply charges were noted; and other annotations were made.

107.    Christine Craighead provided the altered billing records to her staff, which generated claim forms reflecting defendants' charges.

108.    Billing clerks then entered information from the claim forms into the ACS billing system for transmission to DOL.

109.    Unlike the altered superbills, the claim forms showed no sign of manipulation. As such, the true nature of Christine Craighead's review and modification of the superbills was not apparent to those who might later review defendants' claims.

110.    On occasion, if time was short, Christine Craighead's staff would enter billing information directly from the altered superbills into the ACS system, without the intermediate step of creating a claim form.

111.    The following diagram illustrates defendants' billing flow:



112.    To illustrate the billing scheme described above, the United States has attached

Exhibit ##2 and 3.

113.    Exhibit #2 is an original superbill from the Corpus Christi clinic reflecting

physical therapy charges for 2 units of electrical stimulation (CPT code 97032) and 1 unit of

manual therapy (CPT code 97140) on June 17, 2011.  The superbill reflects the services

performed in the clinic and the charges the clinic submitted to Austin for billing.  The charges on

the superbill total less than $100.

114.    Exhibit #3 is an altered version of the same superbill.  It has been modified to add

charges for a detailed medical examination of the patient (CPT code 99214), 1 unit of ultrasound

therapy (CPT code 97035), 5 units of therapeutic exercise (CPT code 97110), 2 units of gait

training (CPT code 97116), 5 units of kinetic activities (CPT code 97530), and 2 units of

ADL/self-training (CPT code 97535).  The modified superbill also increases the number of units

of manual therapy (CPT code 97140) from 1 to 5.  Christine Craighead submitted, or caused her

staff to submit, these fictitious charges to the DOL, which paid UTC $1,049.41 for this encounter on or about June 30, 2011.

115.   Christine Craighead typically did not complete her review of the superbills until late in the week, creating a last-minute push to get out the weekly billing by the DOL's deadline and leaving little time for staff to review or question the defendants' charges.

116.   Christine Craighead kept erratic hours.  She came to the office at the end of the work day and stayed late into the evening, or did not come in at all.  Christine Craighead's irregular schedule ensured that her conduct was not transparent to her staff.

117.   Defendants attempted to conceal Christine Craighead's modification of the superbills by ordering the clinics to destroy their original billing records.  Pursuant to defendants' Corporate Office Billing Protocol, the clinics were required to shred original billing documents after they were sent to headquarters for processing.  This corporate policy helped defendants eliminate evidence of their misconduct.

118.   Garry Craighead created financial incentives to inflate defendants' claims.  He tied Christine Craighead's compensation to the amount of the weekly billing.  And he used CCM&D to pay bonuses to Christine Craighead and her staff based on billing performance:

119.    Garry Craighead also set minimum billing and revenue requirements that he ordered Christine Craighead and his staff to achieve.

120.    The combination of financial incentives and minimum billing requirements ensured that the pursuit of arbitrary revenue goals, rather than the legitimate practice of medicine, drove defendants' billing.

121.    Through the billing scheme described above, defendants submitted and caused others to submit thousands of false claims to the DOL, including:

**1.    False Claims for Evaluation & Management Services**

122.    Evaluation & Management ("E&M") codes describe the services that a doctor provides to a patient during an appointment.

123.    There is a set of E&M codes for new patients (CPT codes 99201 to 99205), and another set for established patients (CPT codes 99211 to 99215).  FECA reimburses new patient E&M codes at a higher rate than established patient codes.

124.    Both sets of E&M codes range in complexity from level 1 (routine/least demanding) to level 5 (most complicated/severe).  The FECA program reimburses higher level E&M codes at a higher rate.

125.    Health care providers must select the CPT code that accurately describes the nature and level of E&M services rendered.  The AMA has issued objective criteria and guidance for selecting the appropriate E&M code.

126.    Defendants knew of and deliberately ignored or recklessly disregarded the AMA's guidelines and FECA program rules for E&M services.

127.    Defendants knowingly inflated their claims to DOL by upcoding their E&M services and billing for services that were not rendered.

128.    Upcoding is the practice of billing for a higher level or more expensive service than the provider actually rendered.  Defendants upcoded their E&M claims by misrepresenting the level and nature of their E&M services.

129.    Exhibit #4 is an altered superbill for E&M and related services rendered to a patient on April 5, 2011.  The doctor who saw the patient selected established patient E&M code 99213, indicating that the encounter was low to moderate complexity.  Christine Craighead altered the superbill by circling E&M code 99215, indicating that the visit should be billed as a high complexity level 5 encounter.  Defendants falsely charged the FECA program for the level 5 service, as Christine Craighead instructed, causing the DOL to overpay by more than $100.

130.    Exhibit #4 is one example of a pattern and practice of E&M upcoding and billing for services that were not rendered that, in the aggregate, has damaged the FECA program.

131.    Defendants were among the most prolific billers of E&M services nationwide.  From January 1, 2009 to December 31, 2013, the four clinics in Austin, Killeen, San Antonio, and Corpus Christi submitted more than 13,000 claims to DOL for level 5 E&M services alone.  The DOL paid defendants over $2.5 million for these highest-complexity services.

132.    Defendants also submitted false claims for medical services that were performed by unqualified personnel.

133.    Services are eligible for reimbursement under FECA if they are prescribed or recommended by a "qualified physician."  20 C.F.R. § 10.310(a).

134.    A chiropractor is not a qualified physician under FECA, except for two limited purposes.  5 U.S.C. § 8101(2).  A chiropractor may be reimbursed for (1) "treatment to correct a spinal subluxation," and (2) "services in the nature of physical therapy under the direction of, and as prescribed by, a qualified physician."  20 C.F.R. § 10.311(a), (e).

135.    A provider may not bill for physician services that were actually performed by a chiropractor.  20 C.F.R. § 10.801(d).

136.    Defendants billed the DOL for medical services performed by chiropractors who were not qualified under FECA to render them.

137.    Exhibit #5 is a superbill for services rendered to patient ES on March 26, 2010, by Charles Evans, a chiropractor.  The superbill reflects a charge for level 3 E&M services (CPT code 99213).  Christine Craighead or a member of her staff upcoded the E&M service to level 4 (CPT code 99214), and then billed this inflated charge to the DOL.  The E&M charge is false at either level because Evans, a chiropractor, was not qualified to perform and bill for medical services under FECA.

138.    Defendants knew of and deliberately ignored or recklessly disregarded the FECA program's limitation on chiropractor services, and took steps to obscure their use of chiropractors to render medical care.

139.    On April 8, 2010, Candice Aguirre, one of Christine Craighead's subordinates, emailed Brenda Rodriguez, the manager of the Corpus Christi clinic, regarding patient ES.  The email instructed Rodriguez not to submit documentation bearing Evan's signature because the DOL would not reimburse for medical care provided by a chiropractor:

From:       Candice Aguirre <utccandice@gmail.com>
Sent time:  Thursday, April 08, 2010 7:05:19 PM
To:         Brenda Rodriguez <utcbrenda@gmail.com>
Subject:    Re: E        S

I will write him a narrative.  If he sends anything to them, go through it and dont let them send anything with Dr.
Evans signature on it cause they will automatically deny if they think he is treating under a chiro.  Please email me
his entire file, except therapy section, and the 30 day letter and I will get done ASAP.

Thanks,
Candice Aguirre
Workers' Compensation Case Manager
Union Treatment Centers
8900 Shoal Creek Blvd Bldg 200
Austin, TX 78757
512.323.6900\PH   512.323.6903\Fax

140.    The claim for services rendered to patient ES is one example of defendants'
pattern and practice of billing for chiropractor services that were not eligible for reimbursement
under the FECA program.

141.    Defendants' false claims for E&M services cannot be listed here in full because
they are too voluminous and contain protected health information.  To maintain patient
confidentiality and ensure compliance with the Health Insurance Portability and Accountability
Act ("HIPAA"), the United States will produce claims data spreadsheets reflecting defendants'
false claims for E&M services following the entry of a protective order governing access to and
use of the data.

**2.    False Claims for Prolonged Services**

142.    Prolonged services codes compensate doctors for services that take more time to
perform than expected.  They are extraordinary codes that cover time spent "beyond the usual"
time to complete a service.

143.   There is a set of prolonged service codes for services involving direct patient contact (CPT codes 99354 and 99355), and another for services that do not involve direct patient contact (CPT codes 99358 and 99359).

144.   Both sets of codes are time based.  To bill these codes, a provider must accurately document the extra time spent rendering the service.

145.   CPT code 99354 covers the first hour of a prolonged service involving face-to-face contact, and code 99355 covers each additional 30 minutes after the first hour.

146.   CPT code 99358 covers the first hour of a prolonged service without face-to-face contact, and code 99359 covers each additional 30 minutes after the first hour.

147.   To bill prolonged codes, a provider must spend *at least* 30 minutes rendering prolonged services.  The AMA has issued objective criteria and guidance governing the use of prolonged service codes.  The AMA has warned, for example, that a "[p]rolonged service of less than 30 minutes total duration on a given date is not separately reported because the work involved is included in the total work of the evaluation and management codes."  American Medical Association, Current Procedural Terminology 2012, at 31 (4th ed. 2012).

148.   The following table shows the time requirements for billing prolonged services:

| Time spent rendering prolonged services | Prolonged service with face-to-face patient contact (CPT codes 99354, 99355) | Prolonged service without face-to-face patient contact (CPT codes 99358, 99359) |
|---|---|---|
| Less than 30 minutes | Not permitted | Not permitted |
| 30 to 74 minutes | 99354 x 1 unit | 99358 x 1 unit |
| 75 to 104 minutes | 99354 x 1 unit<br>99355 x 1 unit | 99358 x 1 unit<br>99359 x 1 unit |
| 105 minutes or more | 99354 x 1 unit<br>99355 x N units | 99358 x 1 unit<br>99359 x N units |

149.    DOL rules forbid prolonged service code abuse and warn providers not to bill "for extended medical appointments when the employee actually had a brief routine appointment." 10 C.F.R. § 10.801(d).

150.    Defendants knew of and deliberately ignored or recklessly disregarded the AMA and DOL rules governing prolonged services and submitted false claims for prolonged services that were not rendered, documented, or eligible for reimbursement.

151.    Christine Craighead submitted and caused others to submit prolonged service claims for routine tasks, without regard to the amount of time required to complete those tasks or who performed them.

152.    Christine Craighead billed, or directed others to bill, CPT code 99354 when a doctor reviewed a diagnostic report, such as an MRI.

153.    Christine Craighead billed, or directed others to bill, CPT code 99358 when a doctor or staff member completed a Duty Status Report known as a CA-17. The CA-17 is a DOL form that identifies a patient's work limitations, such as how much a patient can lift or how long a patient can stand. It takes, at most, a few minutes to complete.

154.    The review and completion of reports are basic tasks that are encompassed by E&M codes. These tasks may not be billed as prolonged services absent extraordinary circumstances and documentation of the time required to complete them.

155.    Defendants' medical records do not document the extra time or medical circumstances required to bill for any prolonged services.

156.    Exhibit #6 is an original superbill reflecting services provided to patient JN on June 21, 2011. The physician who examined JN selected established patient E&M code 99213, indicating that the encounter was low to moderate complexity. According to the AMA's

guidelines, a level 3 established patient visit typically involves 15 minutes of face-to-face contact between doctor and patient.

157.     Exhibit #7 is an altered copy of the same superbill.  It has been modified to increase the E&M service from level 3 to level 4 (CPT code 99214) and indicates that 2 units of prolonged service with face-to-face contact (CPT code 99354 x 2) and 1 unit of prolonged service without patient contact (CPT code 99358) should also be billed.  Christine Craighead submitted, or caused her staff to submit, these false charges to the DOL.  The DOL paid defendants over $300 for prolonged services that were not rendered, documented, and/or eligible for reimbursement.

158.     Several physicians and employees informed Garry Craighead and Christine Craighead that charging the DOL for prolonged services was improper.

159.     In November and December, 2011, for example, Dr. Bernabe Canlas notified Garry Craighead that the prolonged service charges added to his bills were fraudulent and demanded that they be reversed.

160.     Dr. Canlas specifically directed Garry Craighead to the rules for using prolonged service codes.

161.     Between September, 2011 and January, 2012, several employees informed Christine Craighead that prolonged service codes were inappropriate.

162.     Despite these complaints, Garry Craighead and Christine Craighead caused defendants to continue billing the DOL for unsupported, undocumented, and ineligible prolonged services.

163.     The Exhibits and events described above are examples of a pattern and practice of false prolonged service claims that, in the aggregate, has damaged the FECA program.

164.    From January 1, 2009 to December 31, 2013, the four UTC clinics in Austin, Killeen, San Antonio, and Corpus Christi submitted more than 17,000 claims for payment of prolonged services.  The DOL paid defendants over $3 million on these claims for services that were not provided, documented, or eligible for reimbursement.

165.    Defendants' false claims for prolonged services cannot be listed here in full because they are too voluminous and contain protected health information.  To maintain patient confidentiality and ensure compliance with HIPAA, the United States will produce claims data spreadsheets reflecting defendants' false claims for prolonged services following the entry of a protective order governing access to and use of the data.

### 3.    False Claims for Physical Medicine & Rehabilitation Services

166.    Physical medicine and rehabilitation ("PM&R") codes cover skilled rehabilitation services, such as physical therapy ("PT"), delivered by a qualified professional.

167.    PM&R services, such as PT, are measured in 15-minute intervals called "units."

168.    When billing a PM&R service, a provider must identify the service or "modality" by its CPT code and the number of units rendered.  For example, if a therapist delivers 30 minutes of gait training (CPT code 97116), the therapist would bill the FECA program for two units of that service (CPT code 97116 x 2).

169.    Defendants knowingly submitted and caused others to submit to DOL false claims for PM&R services.  They padded their bills by inflating the number of units of service provided and by adding charges for PT modalities that were not performed.

170.    Defendants' misconduct was most flagrant during the first 120 days after a patient's date of injury ("DOI").

171.    Under the FECA program, PT is presumptively authorized during the first 120-days after a patient's DOI.  During this 120-day window, the DOL does not require providers to obtain pre-approval before delivering and billing for PT services.  Medical documentation and approval is required after the 120-day period ends.

172.    Defendants viewed this 120-day window as an opportunity to maximize their revenue.  Their corporate policy directed the clinics to commence PT services immediately and to use aggressive, high-intensity PT plans during the first 120 days.  The policy encouraged the clinics to initiate PT even without diagnostics, to deliver the maximum number of units of each modality, and to schedule patients for daily therapy during the first 120 days.  The policy even identified the CPT codes and number of units that should be billed.  Christine Craighead monitored and enforced compliance with these directives.

173.    Christine Craighead established a pre-determined regimen of 8 PT modalities and 24 units of service that she required to be billed to the DOL:

| CPT CODE | MODALITY | UNITS |
|---|---|---|
| 97032 | Electrical stimulation | 2 |
| 97035 | Ultrasound therapy | 1 |
| 97110 | Therapeutic exercises | 5 |
| 97116 | Gait training | 2 |
| 97140 | Manual therapy | 5 |
| 97530 | Kinetic activities | 5 |
| 97535 | ADL/Self training | 2 |
| 97112 | Neuromuscular training | 2 |
| Totals: | 8 modalities | 24 units |

This regimen was most often used for new patients or during the first 120 days after a patient's DOI.  Christine Craighead billed or caused others to bill this regimen without regard to whether the services were actually performed or clinically indicated.  If the clinics failed to render or document the pre-determined services, Christine Craighead manipulated the superbills to reflect her required modalities and units, which defendants then billed to the DOL.

174.    Exhibit #8 is a group of four altered superbills reflecting PT charges for patient JC in January, 2011.  The superbills document services rendered during the 120-day window after JC's DOI.  Christine Craighead altered each superbill to correspond to her 8-modality/24-unit PT regimen.  Christine Craighead then billed, or caused her staff to bill, these false and inflated charges to the DOL, which caused the agency to pay for PT services that were not rendered.

175.    Exhibit ##2 and 3 further illustrate defendants' pattern of false PT billing.  Exhibit #2 is an original superbill for PT services reflecting 2 modalities and 3 units of service that were performed in the clinic.  Exhibit #3 is an altered version of the same superbill.  It has been modified to increase the number of modalities (to 7) and units of service (to 22).  When defendants billed this encounter, they added another modality (CPT code 97112) and more units to meet Christine Craighead's scripted regimen.  By adding PT services that were not rendered and inflating the number of units of therapy, defendants caused the DOL to overpay for this single PT encounter by roughly $1,000.

176.    The pre-determined 8-modality/24-unit regimen varied depending on the patient's injury.  If a patient was being treated for a shoulder injury, for example, the 2 units of gait training (CPT code 97116) would be omitted.  The resulting billing pattern for the patient would reflect 7 modalities and 22 units of service per PT encounter.

177.    The following table is a partial list of claims for PT services allegedly rendered to patient EB for a left shoulder/arm injury during the 120-day period following his DOI:

| Date of Service | 97032 | 97035 | 97110 | 97116 | 97140 | 97530 | 97535 | 97112 | Total Modalities | Total Units |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/22/11 | 2 | 1 | 5 | 0 | 5 | 5 | 2 | 2 | 7 | 22 |
| 6/23/11 | 2 | 1 | 5 | 0 | 5 | 5 | 2 | 2 | 7 | 22 |
| 6/28/11 | 2 | 1 | 5 | 0 | 5 | 5 | 2 | 2 | 7 | 22 |
| 6/29/11 | 2 | 1 | 5 | 0 | 5 | 5 | 2 | 2 | 7 | 22 |
| 6/30/11 | 2 | 1 | 5 | 0 | 5 | 5 | 2 | 2 | 7 | 22 |

Because defendants were treating EB for an upper extremity injury, they did not bill for gait

training (CPT code 97116).  The resulting billing pattern reflects 7 modalities and 22 units of

service per PT encounter.  Between May 2, 2011 and July 21, 2011, defendants billed this 7-

modality/22-unit pattern, or comparable charges, 39 times for patient EB.

178.    From January 1, 2009 to December 31, 2013, the DOL paid defendants over $4.9

million for PT services that corresponded or were comparable to Christine Craighead's pre-

determined regimen of 8 modalities and 24 units of service.

179.    Defendants' false claims for PM&R services were not limited to new patients or

to the first 120 days after a patient's DOI.  Christine Craighead and her staff submitted and

caused others to submit false claims for services and units of therapy that were not performed

over the entire course of a patient's rehabilitation.

180.    The Exhibits and events highlighted above are examples of a pattern and practice

of false claims for PM&R services that, in the aggregate, has damaged the FECA program.

181.    Defendants' false claims for PM&R services cannot be listed here in full because

they are too voluminous and contain protected health information.  To maintain patient

confidentiality and ensure compliance with HIPAA, the United States will produce claims data

spreadsheets reflecting defendants' false claims for PM&R services following the entry of a

protective order governing access to and use of the data.

**4.    False Claims for Supplies and Other Services**

182.    Defendants submitted false claims for other items, including testing services,

surgical consults and procedures, and medical supplies.

183.    **Diagnostic and other tests billed under Creekside Diagnostics.**  Defendants

falsely billed the DOL for tests, including electromyography ("EMG") and nerve conduction

study ("NCS") procedures. These tests measure muscle and nerve function and screen for damage and abnormalities. Physicians hired by Garry Craighead performed EMG and NCS procedures on UTC patients in UTC's clinics. Superbills documenting these procedures were then collected and submitted to defendants' billing department in Austin. Christine Craighead or one of her subordinates altered the superbills and then billed or instructed others to bill inflated EMG and NCS charges to the DOL under Creekside Diagnostics' provider number.

184.    Exhibit #9 is a superbill completed by Dr. Anjali Jain, a Creekside Diagnostics physician hired by Garry Craighead to perform EMG and NCS procedures. On her superbill, Dr. Jain documented the five services she performed on patient SR on August 24, 2011.

185.    When defendants billed for Dr. Jain's services, however, they added a sixth service that is not recorded on the superbill. Specifically, Christine Craighead or a member of her staff added and billed for CPT code 95926, which is the code for a short latency somatosensory evoked potential study, stimulation of any/all peripheral nerves or skin sites, recording from the central nervous system in the lower limbs. Dr. Jain did not document that this test had been performed, and did not authorize a charge for that service. CPT code 95926 is not even an option on Dr. Jain's superbill, indicating that it is not a procedure that Dr. Jain commonly performs in her practice. The charge for CPT code 95926 was falsely included and billed to DOL by Christine Craighead or someone acting at her direction. As a result, the DOL paid Creekside Diagnostics $300 for a test that was not performed or documented.

186.    Exhibit #9 is an example of a pattern and practice of false claims for testing services that, in the aggregate, has damaged the FECA program.

187.    **Surgical consults and procedures billed under Creekside Surgical.** Defendants falsely billed the DOL for surgical consults. Physicians hired by Garry Craighead

examined UTC patients in UTC's clinics.  Superbills documenting the services rendered by these physicians would then be collected and submitted to defendants' billing department in Austin. Christine Craighead or one of her subordinates altered the superbills and then billed or instructed others to bill the altered charges to the DOL under Creekside Surgical's provider number.

188.    Exhibit #10 is a superbill completed by Dr. Bernabe Canlas, a Creekside Surgical podiatrist hired by Garry Craighead to examine and operate on patients with foot and ankle injuries.  The superbill documents the services Dr. Canlas rendered to patient JF on July 13, 2011.  Those services included a level 4 E&M examination (CPT code 99214) and injections into the patient's right ankle (codes J1030 and 20605).

189.    When defendants billed for Dr. Canlas's services, however, they added charges he did not record on his superbill.  Christine Craighead or a member of her staff added and billed for prolonged service code 99358 and injection code J1094, neither of which are listed as options on Dr. Canlas's superbill.  Dr. Canlas did not indicate or document that prolonged services or an additional injection had been performed, and did not authorize charges for those services.  The charges for prolonged services and extra injection were falsely included and billed to DOL by Christine Craighead or someone acting at her direction.  As a result, the DOL paid Creekside Surgical $105 for services that were not performed or documented.

190.    Defendants fabricated surgical procedure charges as well.  On July 28, 2011, for example, Dr. Canlas operated on patient JF's right ankle.  In his Operative Report, Dr. Canlas noted that three procedures were performed on JF and specified the three corresponding CPT codes that should be billed (CPT codes 29892, 27698, and 28300).

191.    When defendants billed the DOL for JF's surgery, however, they included two additional surgical charges under CPT code 29898, which refers to arthroscopic surgery on the

ankle (debridement, extensive).  CPT code 29898 is not listed in Dr. Canlas' Operative Note, and nothing in his surgical records indicates that two additional arthroscopic procedures were performed on July 28th.  These two arthroscopy charges are fabricated.

192.    Christine Craighead or someone acting at her direction falsely included and billed the DOL for the two arthroscopy charges under CPT code 29898.  The charges for these codes exceeded $3,200.  The DOL paid Creekside Surgical $407 for surgical procedures that were not performed or documented.

193.    The examples described above are part of a pattern and practice of false claims for surgical consults and procedures that, in the aggregate, has damaged the FECA program.

194.    **Supplies**.  Durable medical equipment ("DME") is a generic term encompassing medical supplies, appliances, and equipment – everything from canes to power wheelchairs.

195.    Under the FECA program, a DME charge is reimbursable if the DME is (1) prescribed or recommended by a qualified physician, (2) actually provided, and (3) necessary to treat the patient's work-related injury.  20 C.F.R. § 10.310(a).

196.    Garry Craighead and Christine Craighead pressured their employees and health care providers to maximize defendants' DME revenues.

197.    As a result of this pressure, defendants falsely billed the DOL for medical supplies that had not been prescribed by a doctor; were not actually supplied to the patient; and/or were not necessary to treat the patient's work-related injury.

198.    For example, although defendants specialized in treating workplace injuries, most of which were orthopedic, it was defendants' standard protocol to bill the DOL for vitamins that were allegedly handed out to patients.

199.    Defendants charged $125 for a one-month supply of vitamins.

36

200.    Defendants billed for vitamins under CPT code 99070.

201.    CPT code 99070 is a generic code for supplies and materials provided by a physician to a patient over and above those usually included with an office visit or other services. The code does not correspond to a particular supply or item; it is a non-specific code that refers to medical supplies generally.  Thus, defendants' billings for unspecified supplies under CPT code 99070 did not alert the DOL to the fact that it had been charged for vitamins.

202.    Exhibit #11 is an altered superbill, which has been modified to indicate that the DOL should be charged $125 for a vitamin pack under CPT code 99070.  According to the superbill, the patient at issue had suffered a low back injury.  The DOL paid defendants $125 for the vitamins on or about June 2, 2011.

203.    The vitamin charge was falsely included and billed to the DOL by Christine Craighead or someone acting at her direction.

204.    As a result, the DOL paid defendants for supplies that were not medically necessary to treat their patients' work-related injuries and were not eligible for reimbursement under the FECA program.

205.    Exhibit #12 is an example of a pattern and practice of false claims for supplies that, in the aggregate, has damaged the FECA program.

206.    Between January 1, 2009 and December 31, 2013, the DOL paid defendants over $500,000 for vitamins that were allegedly provided to patients at the Austin, Killeen, San Antonio, and Corpus Christi clinics.

207.    Defendants' false claims for supplies and other services cannot be listed here in full because they are too voluminous and contain protected health information.  To maintain patient confidentiality and ensure compliance with HIPAA, the United States will produce

claims data spreadsheets reflecting defendants' false claims for supplies and other services following the entry of a protective order governing access to and use of the data.

## C. The Kickback Schemes

208.    Between September 1, 2011 and December 31, 2013, defendants received remuneration in exchange for referring their federal patients to third-party health care providers for services that could then be billed to the FECA program in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1), and the False Claims Act, 31 U.S.C. § 3729(a).

209.    Generally speaking, the schemes worked as follows:  (a) a third-party health care provider, like a hospital or pharmacy, agreed to pay CCM&D, Garry Craighead's marketing company, for sham services; (b) in exchange, defendants agreed to refer their FECA patients to the third party for services, like surgery and pain management procedures or to have their prescriptions filled; and (c) the third party then billed the DOL for the services rendered to defendants' patients.  The claims for payment submitted to the DOL were false because they resulted from and were tainted by kickbacks, 42 U.S.C. § 1320a-7b(g).

210.    By engaging in these illicit patient referral practices, defendants submitted, and caused and conspired with others to submit, false claims to the DOL in violation of the False Claims Act, 31 U.S.C. § 3730(a)(1)(A), (C).

### 1.    Forest Park Medical Center

211.    In September and October, 2011, Garry Craighead and Christine Craighead met and communicated with officials from Forest Park Medical Center ("FPMC"), a physician-owned hospital located in Dallas, Texas.

212.    Following their meetings and communications with FPMC, Garry Craighead and Christine Craighead, for themselves and for the defendant entities, expressly and through their

actions, agreed to refer patients from UTC to FPMC for surgeries and other procedures and to

provide UTC and Creekside physicians who would perform those services at the hospital.

213.    In exchange for the patient referrals, FPMC agreed to pay CCM&D $50,000 per

month, under the guise of a fee for marketing, consulting, and management services.  These

services were a sham.  CCM&D provided no services to FPMC, other than patient referrals.

214.    The object of the parties' agreement was to submit and cause others to submit

false claims for payment to the FECA program in violation of the Anti-Kickback Statute and the

False Claims Act.

215.    The parties pursued and effectuated this agreement through the referral of FECA

patients from defendants' clinics to FPMC for services that could then be billed to the DOL by

both parties.  FPMC billed the DOL for hospital services rendered to defendants' patients, and

defendants billed for the professional services performed by their physicians.  Both sides

benefited from the referral arrangement and each of the defendants committed overt acts in

furtherance of the parties' common objective, including:

a.    On October 17, 2011, CCM&D issued Invoice #101511 to FPMC for

payment of purported marketing, consulting, and management services totaling $50,000.  Garry

Craighead simultaneously notified an FPMC official that the first "batch" of cases would be

forthcoming and he designated Christine Craighead to coordinate patient referrals to the hospital.

b.    On or about October 17, 2011, a company called Adelaide Business

Solutions, LLC ("Adelaide") issued a check payable to CCM&D in the amount of $50,000 on

behalf of FPMC.  FPMC gave Adelaide the money to cover this payment (and all such

payments) to CCM&D.  On information and belief, FPMC paid CCM&D through Adelaide to

conceal the transaction.

c.      CCM&D deposited the check into its bank account on or about October 17, 2011.

d.      On October 20, 2011, Christine Craighead sent FPMC a list of UTC and Creekside physicians and requested the paperwork necessary to get the physicians credentialed to provide services at the hospital.

e.      On October 31, 2011, Christine Craighead sent FPMC a list of UTC patients with approved procedures and urged the hospital to begin scheduling their cases. Christine Craighead also designated one of her subordinates to assist the hospital with scheduling the patients and physicians for the procedures.

f.      Defendants encountered difficulty delivering the promised referral volume because their patients – who lived primarily in the Austin, Killeen, San Antonio, and Corpus Christi areas – balked at traveling to Dallas for services they could obtain in their own communities.

g.      To induce reluctant patients to travel to FPMC, Garry Craighead agreed to cover the cost of their travel to Dallas.

h.      Garry Craighead authorized and directed CCM&D to purchase airline tickets for patients.  The following is a partial list of such purchases:

| Patient | Date | Amount | Description |
|---------|------|--------|-------------|
| AJ | 1/19/12 | $358.70 | CCM&D purchased airfare for UTC patient to travel from Corpus Christi to Dallas for treatment |
| BM | 1/19/12 | $358.70 | CCM&D purchased airfare for UTC patient to travel from Corpus Christi to Dallas for treatment |
| DV | 1/19/12 | $363.60 | CCM&D purchased airfare for UTC patient to travel from San Antonio to Dallas for treatment |

40

    i.       CCM&D and Creekside Surgical also reimbursed patients for travel costs:

| From: | Jennifer Garcia <jenniferutc1@gmail.com> |
|---|---|
| Sent: | Tuesday, November 8, 2011 3:47 PM |
| To: | JONI MEEK-credentialing <UTCJMEEK@GMAIL.COM>; PAM RICE-Creekside surgical & diagnostic <UTCPAM@GMAIL.COM>; THERESA DIAZ Creekside Surgical & Diagnostic <UTCTHERESA@GMAIL.COM>; donniutc@gmail.com; utcbeverly@gmail.com; ▓▓▓▓▓@yahoo.com |
| Subject: | Right Shoulder Arthroscopy November 22,2011 |
| Attach: | G▓▓▓ G▓▓▓doc |

Per our conversation your Right Shoulder Arthroscopy surgery is scheduled for November 22, 2011 at Forest Park Medical Center, located at 11990 North Central Expressway, Dallas, Texas 75243. You need to arrive at the hospital by 7am on the day of the procedure. We will reimburse you up to $150.00 for your travel to the hospital for your procedure. A member of the Forest Park Medical Center's pre op department will call you prior to your procedure with further instructions.

At this time if you are taking aspirin or any type of NSAID' please discontinue them two weeks prior to your procedure. If you are taking aspirin under doctors' orders, please contact the physician to let him know that you are having surgery. If he instructs you to continue these types of medication please continue these medications and just notify me at 512-323-6900.

If you have any further questions please do not hesitate to contact a member of our team by phone (512)323-6900 ask for Jennifer Garcia or email

Please respond to this email as confirmation of receipt.

Thank you,
Creekside Surgical

    j.       On November 15, 2011, CCM&D issued Invoice #111511 to FPMC for payment of purported marketing, consulting, and management services totaling $50,000.

    k.       On or about November 15, 2011, Adelaide issued a second check payable to CCM&D for $50,000 on behalf of FPMC, which CCM&D deposited into its bank account on or about that date.

    l.       UTC began referring patients to FPMC in late November, 2011.  The initial referrals were sporadic and limited.

    m.       On December 12, 2011, CCM&D issued Invoice #121511 to FPMC for payment of purported management services totaling $50,000.

    n.       On December 14, 2011, Garry Craighead attempted to assuage FPMC's concerns about the low patient referral volume by offering to reduce CCM&D's monthly charge

to $30,000 and by promising that he would hire more orthopedic surgeons to operate at the

hospital.  Garry Craighead assured FPMC that the number of referrals would increase.

        o.        On or about December 15, 2011, Adelaide issued a third check payable to

CCM&D for $50,000 on behalf of FPMC, which CCM&D deposited into its bank account on or

about that date.

        p.        On December 22, 2011, Garry Craighead informed FPMC that he had

directed Christine Craighead to start "loading up" surgical days at the hospital.

        q.        Despite Garry Craighead's assurances, defendants' referrals to FPMC

languished through the end of 2011.

        r.        On December 26, 2011, an FPMC executive complained to Garry

Craighead about the dearth of patient referrals from defendants:

> From: Alan Beauchamp
> Sent: Monday, December 26, 2011 2:35 PM
> To: drgarryutc@aol.com
> Cc: Andrea Smith
> Subject: Re: Hello. Re: MRI
>
> Garry,
> It's appears that your projections of cases have fallen whole-fully short. You said 20 in November and 40 in
> December. I want to sit down as soon after the beginning of the year and before the 15th to find out why my
> $150k investment has not produced Jack. Now we're being asked to do MRIs without certification.
> Let me know when you can meet with Andrea and I.
> Thanks.
> Alan

        s.        The volume of patient referrals from defendants to FPMC picked up in

early 2012.  The following is a partial list of the referrals; the amounts FPMC and defendants

billed the DOL; and the amounts DOL paid for the services:

| UTC Patient | Date of service | Amount FPMC billed for hospital services | Amount DOL paid FPMC | Amount Creekside Surgical billed for professional services | Amount DOL paid Creekside Surgical |
|---|---|---|---|---|---|
| AM | 1/17/12 | $33,016.48 | $6,953.62 | $1,918.00 | $921.68 |
| CJ | 1/19/12 | $17,737.20 | $3,859.35 | $1,848.00 | $217.37 |
| EO | 2/8/12 | $35,975.36 | $5,975.36 | $2,028.00 | $985.08 |
| GR | 2/8/12 | $62,070.08 | $11,258.08 | $14,134.00 | $3,408.36 |
| WW | 2/8/12 | $27,675.70 | $5,787.69 | $1,242.00 | $602.55 |

      t.      The Creekside companies provided the physicians who performed the procedures summarized in the chart above as well as others performed at FPMC.

      u.      UTC personnel scheduled the UTC patients and Creekside physicians for the procedures summarized in the chart above as well as others performed at FPMC.

      v.      The Creekside companies and CCM&D paid the Creekside physicians for performing the procedures summarized in the chart above as well as others performed at FPMC.

      w.      FPMC billed the DOL for the hospital services summarized in the chart above and was paid for its services.

      x.      Creekside Surgical billed the DOL for the professional services summarized in the chart above and was paid for its services.

      y.      On or about January 16, 2012, CCM&D issued Invoice #11612 to FPMC for payment of purported consulting and management services totaling $25,000.  FPMC did not pay the invoice.

      z.      The parties' referral agreement ended in early 2012.  UTC's final patient referrals occurred in early February, 2012.

    216.    The referral agreement between FPMC and defendants violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)-(2).  FPMC offered and paid defendants' unlawful

remuneration to induce the referral of patients covered by the FECA program. Defendants solicited and received unlawful remuneration from FPMC in exchange for the referral of patients covered by the FECA program. To sustain the agreement, and induce UTC patients to travel to Dallas for services, defendants offered and paid unlawful remuneration to or for the benefit of their patients in the form of airfare, lodging, and travel expense reimbursement.[4]

217.    Through the scheme described above, defendants submitted, and caused and conspired with FPMC to submit, false claims to the DOL for the services rendered to defendants' patients at FPMC. Those claims were false and fraudulent because they resulted from and were tainted by kickbacks. The DOL made substantial payments on the false claims to the detriment of the FECA program and the federal agencies and instrumentalities that support it.

218.    The false claims submitted by defendants and FPMC are voluminous and contain protected health information. To maintain patient confidentiality and ensure compliance with HIPAA, the United States will produce claims data spreadsheets reflecting the false claims following the entry of a protective order governing access to and use of the data.

**2.    Vidor and Family Pharmacy**

219.    In or about September, 2011, Garry Craighead and Christine Craighead, for themselves and for the defendant entities, expressly and through their actions, agreed to refer patient prescriptions to pharmacies owned or operated by Brian Haney and Kevin Gray.

220.    Brian Haney is a pharmacist and operates Vidor Pharmacy in Vidor, Texas. Haney and his pharmacy are referred to collectively as "Vidor Pharmacy."

---

[4]The remuneration defendants paid to patients was part of a larger pattern of unlawful inducements. Between January 1, 2009 and December 31, 2013, defendants paid remuneration, directly and indirectly, to patients in the form of cash, gift cards, expense reimbursement, free airfare and lodging, travel on private jets, and in-kind perks. The purpose of the remuneration was to induce and reward the referral of patients to Union Treatment Center's clinics, physicians, and chosen facilities in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).

221.    Kevin Gray is a pharmacist and operates Family Pharmacy in Pasadena, Texas. Gray and his pharmacy are referred to collectively as "Family Pharmacy."

222.    Vidor and Family Pharmacy (together, "the pharmacies") are unrelated entities, but they conduct or in the past have conducted coordinated business operations.

223.    In exchange for prescription referrals from defendants, Vidor and Family Pharmacy agreed to make monthly payments to CCM&D.  CCM&D provided no services to the pharmacies, other than prescription referrals.  CCM&D did not issue invoices to the pharmacies. Garry Craighead periodically requested that Haney or Gray make payments or deposit funds into CCM&D's account.  The requests were typically made by text or email:

**Example #1 (request to Gray)**          **Example #2 (request to Haney and Gray)**

 

225.    The amount paid to CCM&D varied.  Each month the pharmacies counted the prescriptions defendants had referred; determined how much they had been paid for filling the prescriptions; and then calculated their profit or "margin" on the referred prescriptions after netting out shipping costs.  The pharmacies then paid CCM&D a percentage of their net profit.

45

226.    In November 2011, for example, defendants referred 263 prescriptions to the

pharmacies.  Most of the referrals were for FECA patients.  The pharmacies billed the DOL and

other payors for filling the referred prescriptions.  Their net profit for November was $36,144.95.

By check dated December 21, 2011, the pharmacies paid CCM&D 50% of their net profit, which

equated to $18,072.47, as a kickback for the November prescription referrals:



227.    As a result of their agreement, defendants and the pharmacies shared a common

objective:  to submit and cause others to submit false claims to the FECA program for payment

of prescriptions in violation of the Anti-Kickback Statute and the False Claims Act.

228.    Both parties wanted to maximize the referral of FECA patient prescriptions that

would get billed to and paid by the DOL.

229.    The pharmacies wanted to bill the DOL for as many prescriptions as possible in

order to increase their revenue and net profit.

230.    Defendants shared this goal.  They wanted to enhance the pharmacies' net profit

in order to increase the amount the pharmacies kicked back to CCM&D each month.  Defendants

took steps to maximize the volume and value of the prescriptions they referred to the pharmacies

and committed overt acts in furtherance of the parties' common objective, including:

a.     Garry Craighead negotiated the prescription referral arrangement with Haney and Gray in or about September, 2011.

b.     Garry Craighead controlled defendants' policies and procedures and dictated where UTC's clinics and the Creekside companies sent prescriptions to be filled.

c.     Garry Craighead ordered defendants' Medical Directors to work with Kevin Gray to develop prescription protocols and ensure that defendants' prescriptions were routed to Vidor Pharmacy instead of competitor pharmacies.

d.     Garry Craighead mandated that all prescriptions be sent to Vidor and Family Pharmacy and required his staff and physicians to obtain permission before sending prescription to other pharmacies.

e.     When referrals to Vidor Pharmacy and Family Pharmacy appeared to dwindle in May, 2013, Garry Craighead ordered an audit to identify and correct the problem.

f.     Christine Craighead implemented and oversaw the prescription referral arrangement for Garry Craighead.

g.     Christine Craighead instructed UTC's clinic managers to use the pharmacies.  On or about December 8, 2011, she reiterated that she did not "want any more excuses as to why they are not using the pharmacy."

h.     Christine Craighead periodically reiterated her instruction to refer prescriptions to the pharmacies during meetings and in written communications with her staff.

i.     Christine Craighead distributed, or directed a staff member to distribute, pre-printed prescription and fax forms to facilitate the referrals.  The forms included the information needed to forward FECA prescriptions to Vidor and Family Pharmacy.

j.      Christine Craighead instructed defendants' managers and physicians where to send their prescriptions:   the Austin, San Antonio, and Corpus Christi clinics were to refer prescriptions to Vidor, and the Killeen, Dallas, and Fort Worth clinics were to use Family.

k.      Beginning in late April or early May, 2013, the pharmacies' prescription forms came with pre-printed formulas for compounded medications, which Haney and Gray wanted defendants to prescribe to their patients.

l.      The pharmacies pressured Garry Craighead and Christine Craighead to require their physicians to prescribe compounded medications – namely, pain creams the pharmacies called Myoflam and Antiflam – because such medications can be billed to and are reimbursed by the DOL at higher rates than other prescription medications.

m.      Garry Craighead responded by instructing his Medical Director to develop policies to ensure that the pharmacies' preferred compounded medications would be prescribed by defendants' physicians.

n.      Christine Craighead also heeded the pharmacies' request.  On or about May 6, 2013, she forwarded updated prescription forms for compounded medications to all clinic managers and several of defendants' physicians and directed that the new forms be used.

o.      Christine Craighead monitored and required her staff to track the number of referrals to the pharmacies by each clinic.  The referral numbers were reported to Christine Craighead during weekly management meetings.  The following meeting minutes are exemplary (annotations added):

48

Manager's Meeting

8/14/12

Christine, Alejandro, Quinton, Debbie, Nathalie, Dr. Harris, Susie, Beverly, Kim G., Delia, Clarissa, Nikki, Sandra, Candice, Fernando, Tony, Joni, Fred, Larry, Michelle Perry

Start 10:14 AM

**Metrics**

**Austin:** 11 NP MTD-3 FWC/3 SWC/4 MM/1 LOP; 3 treatment plans; 34 follow ups; 85 follow ups MTD; 16 PTE; 25 PT MTD; 95 PT; 156 PT MTD; 6 rx-2 to Vidor

**San Antonio:** 2 NP-1 MM, 2 FWC; 93 PT sch/105 seen; 5 treatment plans; 111 rx: 60 to Vidor, 51 taken;

Thurs. 8/16/12: Quick Clinic Manager Meeting to go over issues.

**Corpus Christi:** 4 NP-3 FWC/1 SWC; 3 treatment plans; 32 follow ups; 69 PT; 4 rx to Vidor; 5 NP MTD-4 FWC/1 SWC

**Killeen:** 1 NP-FWC; 2 NP MTD; 88 PT sch/77 seen; 8 rx to Vidor; 23 follow ups; 33 follow ups  MTD; good feedback on new dr. "thorough, detailed"

**Dallas:** 13 follow ups; 4 NP-3 MM/1 LOP; 7 NP MTD; 10 Re-PTE; 2 PTE; 126 current patients; 9 rx-5 to Vidor

**Ft. Worth:** 27 follow ups; 1 NP-LOP3;  NP MTD-LOP; 37 treatment plans; 57 treatment plans MTD; 10 rx-4 to Vidor;

      p.      In accordance with the instructions they received from Garry Craighead and Christine Craighead, UTC clinic managers directed their personnel to send all prescriptions to the pharmacies and they provided their staff with the prescription and fax forms needed to make the referrals.

      q.      Defendants' clinics and providers began referring their FECA patient prescriptions to the pharmacies in or about September, 2011.  The referrals continued through at least the end of 2013.

      r.      Garry Craighead and Christine Craighead knew of, authorized, and directed the prescription referrals.

      s.      Between September 1, 2009 and December 31, 2013, UTC and Creekside providers issued thousands of FECA patient prescriptions to the pharmacies in accordance with the instructions they had received from Garry Craighead and Christine Craighead.

      t.      Although most of the referrals were made to and filled by Vidor, the pharmacies shared the prescriptions and related revenue.

u.     The following is a partial list of prescriptions defendants referred to the

pharmacies; the amounts the pharmacies billed the DOL for filling the prescriptions; and the

amounts DOL paid the pharmacies:

| Patient | Clinic | Provider | Pharmacy | Date | Billed | Paid |
|---------|--------|----------|----------|------|--------|------|
| WB | Austin | Chen | Vidor | 10/27/11 | $2,890.60 | $2,658.56 |
| JV | San Antonio | Raposo | Vidor | 4/19/12 | $3,035.89 | $2,801.30 |
| LW | Dallas | Lamarre | Vidor | 6/6/12 | $1,447.24 | $1,342.15 |
| LM | Fort Worth | Lamarre | Vidor | 7/25/12 | $2,328.59 | $2,252.77 |
| CS | Corpus Christi | McKeever | Vidor | 8/9/12 | $331.80 | $319.21 |
| DN | Creekside Surgical (Corpus Christi) | Key | Vidor | 10/5/12 | $620.47 | $601.45 |
| KJ | Austin | Chen | Vidor | 11/27/12 | $1,509.60 | $1,111.31 |
| FS | Austin | Chen | Vidor | 1/15/13 | $1,125.31 | $1,085.05 |
| TR | Killeen | Blancarte | Family | 2/26/13 | $442.26 | $428.15 |
| AJ | Corpus Christi | Key | Vidor | 3/22/13 | $1,417.07 | $1,351.73 |
| FS | Austin | Chen | Vidor | 4/10/13 | $120.89 | $118.85 |
| MP | Austin | Martens | Vidor | 5/23/13 | $126.60 | $124.27 |
| GJ | Dallas | Lamarre | Family | 6/14/13 | $181.65 | $180.57 |
| EH | Corpus Christi | Thulin | Vidor | 7/11/13 | $599.25 | $569.52 |

v.     In exchange for the referral of FECA patient prescriptions, the pharmacies

made the following payments to CCM&D between September 1, 2011 and December 31, 2013:

| Pharmacy | Date | Method of payment | Amount of payment |
|----------|------|-------------------|-------------------|
| Vidor Pharmacy | 11/30/2011 | Wire transfer | $25,226.41 |
| Vidor Pharmacy | 12/21/2011 | Check #20130 | $18,072.47 |
| Vidor Pharmacy | 1/18/2012 | Check #20144 | $16,615.77 |
| Vidor Pharmacy | 2/17/2012 | Check #20157 | $21,307.02 |
| Vidor Pharmacy | 3/9/2012 | Cashier's Check | $7,908.55 |
| Vidor Pharmacy | 3/19/2012 | Cashier's Check | $10,313.61 |
| Vidor Pharmacy | 4/12/2012 | Check #20182 | $18,059.38 |
| Vidor Pharmacy | 5/15/2012 | Check #3003 | $17,493.01 |
| Vidor Pharmacy | 6/12/2012 | Check #20202 | $18,694.39 |
| Vidor Pharmacy | 7/11/2012 | Check #20211 | $23,492.93 |
| Vidor Pharmacy | 8/8/2012 | Check #20222 | $23,578.36 |
| Family Pharmacy | 9/12/2012 | Check #1092 | $31,686.09 |
| Family Pharmacy | 10/17/2012 | Check #1062 | $40,236.09 |
| Family Pharmacy | 11/19/2012 | Check #1067 | $19,408.26 |
| Family Pharmacy | 12/12/2012 | Check #1073 | $35,033.31 |
| Family Pharmacy | 1/10/2013 | Check #1007 | $29,089.09 |
| Family Pharmacy | 2/14/2013 | Check #1077 | $43,364.89 |

| Pharmacy | Date | Method of payment | Amount of payment |
|----------|------|-------------------|-------------------|
| Vidor Pharmacy | 3/15/2013 | Check #3118 | $36,362.69 |
| Family Pharmacy | 4/16/2013 | Wire transfer | $33,050.68 |
| Family Pharmacy | 5/17/2013 | Wire transfer | $42,743.68 |
| Family Pharmacy | 6/14/2013 | Wire transfer | $44,794.88 |
| Family Pharmacy | 7/10/2013 | Wire transfer | $40,359.20 |
| Family Pharmacy | 8/15/2013 | Wire transfer | $42,682.73 |
| Family Pharmacy | 9/16/2013 | Wire transfer | $50,979.34 |
| Family Pharmacy | 10/16/2013 | Wire transfer | $49,989.02 |
| Family Pharmacy | 11/15/2013 | Wire transfer | $47,442.04 |
|  |  |  | **$787,983.89** |

w.    Vidor Pharmacy paid CCM&D $237,124.59 in total.

x.    Family Pharmacy paid CCM&D $550,859.30 in total.

y.    CCM&D received $787,983.89 from the pharmacies in exchange for prescription referrals from the defendants' clinics and physicians.

z.    Garry Craighead controlled CCM&D's bank account and used the funds deposited into that account to pay his personal expenses and to pay remuneration to third parties to induce and reward the referral of patients to defendants' clinics and physicians.

231.    The prescription referral agreement between defendants and the pharmacies violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)-(2).  The pharmacies offered and paid defendants unlawful remuneration for the referral of patient prescriptions that were covered and paid for by the FECA program.  Defendants solicited and received unlawful remuneration from the pharmacies in exchange for the referral of patient prescriptions that were covered and paid for by the FECA program.

232.    Defendants caused and conspired with Brian Haney, Vidor Pharmacy, Kevin Gray, and Family Pharmacy to submit false claims to the DOL for prescription medicines.  The claims were false and fraudulent because they resulted from and were tainted by kickbacks.

233.    The DOL paid the pharmacies over $3 million for these false claims to the detriment of the FECA program and the federal agencies and instrumentalities that support it.

234.    The false claims defendants caused and conspired with the pharmacies to submit cannot be listed here in full because they are too voluminous and contain protected health information.  To maintain patient confidentiality and ensure compliance with HIPAA, the United States will produce claims data spreadsheets reflecting the false claims following the entry of a protective order governing access to and use of the data.

## COUNT ONE

### 31 U.S.C. § 3729(a)(1)(A)
### False Claims
### [All Defendants Except CCM&D]

235.    The United States incorporates the preceding paragraphs.

236.    Defendants knowingly presented and caused others to present to an officer, employee, agent, or contractor of the United States false claims for payment from the FECA program in violation of 31 U.S.C. § 3729(a)(1)(A), namely, false claims for (a) services and supplies they did not render; (b) upcoded services; (c) inflated amounts of medical and physical therapy services; (d) unnecessary and unreasonable medical and rehabilitation services and supplies; and (e) services and supplies that were not eligible for reimbursement under FECA.

237.    The United States incurred damages because of defendants' misconduct in that the DOL paid the false claims for services and supplies defendants submitted and caused others to submit to the detriment of the FECA program and the federal agencies and instrumentalities that support it.

238.    Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim they presented and caused to be presented for payment.

## COUNT TWO

### 31 U.S.C. § 3729(a)(1)(A)
### False Claims
### [All Defendants]

239.    The United States incorporates the preceding paragraphs.

240.    Defendants knowingly presented and caused others to present to an officer, employee, agent, or contractor of the United States false claims for payment from the FECA program in violation of 31 U.S.C. § 3729(a)(1)(A), namely, false claims for (a) services and supplies rendered to patients referred by defendants in exchange for unlawful remuneration in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1); and (b) services and supplies rendered to patients to whom defendants paid unlawful remuneration in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).

241.    The United States incurred damages because of defendants' misconduct in that the DOL paid the false claims for services and supplies defendants submitted and caused others to submit to the detriment of the FECA program and the federal agencies and instrumentalities that support it.

242.    Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim they presented and caused to be presented for payment.

## COUNT THREE

### 31 U.S.C. § 3729(a)(1)(B)
### False Statements and Records
### [All Defendants Except CCM&D]

243.    The United States incorporates the preceding paragraphs.

244.    Defendants made and used, and caused others to make and use, false records and statements that were material to their false claims, including false certifications and claim forms transmitted to the DOL through the ACS system, to obtain payment from the FECA program in violation of the 31 U.S.C. § 3729(a)(1)(B), namely, false records and statements that were material to false claims for (a) services and supplies they did not render; (b) upcoded services; (c) inflated amounts of medical and physical therapy services; (d) unnecessary and unreasonable medical and rehabilitation services and supplies; and (e) services and supplies that were not eligible for reimbursement under FECA.

245.    The United States incurred damages because of defendants' misconduct in that, in reliance on the false records and statements that defendants made and used and caused others to make and use, the DOL paid false claims for services and supplies to the detriment of the FECA program and the federal agencies and instrumentalities that support it.

246.    Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation defendants committed or caused others to commit.

## COUNT FOUR

### 31 U.S.C. § 3729(a)(1)(B)
### False Statements and Records
### [All Defendants]

247.    The United States incorporates the preceding paragraphs.

248.    Defendants made and used, and caused others to make and use, false records and statements that were material to their false claims, including false certifications and claim forms transmitted to the DOL through the ACS system, to obtain payment from the FECA program in violation of the 31 U.S.C. § 3729(a)(1)(B), namely, false records and statements that were material to false claims for (a) services and supplies rendered to patients referred by defendants in exchange for unlawful remuneration in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1); and (b) services and supplies rendered to patients to whom defendants paid unlawful remuneration in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).

249.    The United States incurred damages because of defendants' misconduct in that, in reliance on the false records and statements that defendants made and used and caused others to make and use, the DOL paid false claims for services and supplies to the detriment of the FECA program and the federal agencies and instrumentalities that support it.

250.    Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation defendants committed or caused others to commit.

## COUNT FIVE

### 31 U.S.C. § 3729(a)(1)(C)
### Conspiracy
### [All Defendants]

251.    The United States incorporates the preceding paragraphs.

252.    Defendants conspired with FPMC and FPMC officials to present to an officer, employee, agent, or contractor of the United States false claims for payment from the FECA program in violation of 31 U.S.C. 3729(a)(1)(C).

253.    The United States incurred damages because of defendants' misconduct in that the DOL paid false claims for services and supplies resulting from and tainted by violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)-(2), to the detriment of the FECA program and the federal agencies and instrumentalities that support it.

254.    Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim for payment they conspired to present.

## COUNT SIX

### 31 U.S.C. § 3729(a)(1)(C)
### Conspiracy
### [All Defendants]

255.    The United States incorporates the preceding paragraphs.

256.    Defendants conspired with Brian Haney, Vidor Pharmacy, Kevin Gray, and Family Pharmacy to present to an officer, employee, agent, or contractor of the United States false claims for payment from the FECA program in violation of 31 U.S.C. 3729(a)(1)(C).

257.    The United States incurred damages because of defendants' misconduct in that the DOL paid false claims resulting from and tainted by violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)-(2), to the detriment of the FECA program and the federal agencies and instrumentalities that support it.

258.    Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim for payment they conspired to present.

## COUNT SEVEN

### Payment by Mistake
### [All Defendants Except CCM&D]

259.    The United States incorporates the preceding paragraphs.

260.    This is a claim for recovery of monies that the DOL paid defendants by mistake.

261.    The DOL paid defendants based on a mistaken and erroneous understanding of material fact, namely, that the claims, records, and statements defendants presented and caused to be presented for payment were true, accurate and eligible for reimbursement.

262.    The DOL, acting in reasonable reliance on the truthfulness and accuracy of the claims, records, and statements defendants presented and caused to be presented to the FECA program, paid defendants monies they were not entitled to receive.

263.    Defendants must account for and repay to the United States all funds paid to them by mistake, in an amount to be determined at trial.

## COUNT EIGHT

### Unjust Enrichment
### [All Defendants]

264.    The United States incorporates the preceding paragraphs.

265.    This is a claim against defendants for unjust enrichment.

266.    Defendants unlawfully obtained and benefited from FECA program payments they were not entitled to receive.

267.    Defendants unlawfully obtained and benefited from the remuneration they solicited and received in exchange for patient referrals.

268.    Defendants unlawfully benefited from the remuneration they paid to induce patient referrals.

269.     Defendants would be unjustly enriched if there were permitted to retain the FECA program funds and remuneration derived from their unlawful patient referral schemes.

270.     Defendants must account for and disgorge to the United States all payments by which they have been unjustly enriched, in an amount to be determined at trial.

## COUNT NINE

### Recoupment of Overpayments
### [All Defendants Except CCM&D]

271.     The United States incorporates the preceding paragraphs.

272.     This is a claim to recoup amounts by which the DOL overpaid defendants for their services and supplies.

273.     The DOL overpaid defendants for services and supplies that were not rendered and/or that were not rendered as described in the claims defendants submitted and caused to be submitted to the FECA program.

274.     Defendants must account for and repay all such overpayments to the Untied States, in an amount to be determined at trial.

## COUNT TEN

### Conversion
### [All Defendants Except CCM&D]

275.     The United States incorporates the preceding paragraphs.

276.     This is a claim for conversion of government property.

277.     Through their claims to the DOL, defendants obtained FECA program funds belonging to the United States.

278.     Defendants retained, dissipated, and failed to return FECA program funds to the United States.

58

279.    Defendants wrongfully exercised dominion and control over FECA program funds to the exclusion of and inconsistent with the rights of the United States, the DOL, and the federal agencies and instrumentalities that support the FECA program.

280.    Defendants acted with malice.

281.    Defendants' systematic overbilling for services and supplies, and their receipt and payment of remuneration in exchange for and to induce the referral of patients covered by the FECA program, were wanton and malicious.

282.    Defendants are liable to the United States for actual and exemplary damages, in amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor and against defendants jointly and severally as follows:

283.    On Counts One, Two, Three, Four, Five, and Six under the False Claims Act, against the defendants named in each count, for treble the damages sustained by the United States, plus a civil penalty of $5,500 to $11,000 for each violation, interest, and costs, together with all such further relief as may be just and proper.

284.    On Counts Seven, Eight, and Nine, against the defendants named in each count, for damages in the amount by which such defendants were paid by mistake, unjustly enriched, and overpaid for their services and supplies, plus interest and costs, together with all such further relief as may be just and proper.

285.    On Count Ten, against the defendants named in that count, for actual and exemplary damages, plus interest and costs, together with all such further relief as may be just and proper.

Date:  June 22, 2015

Respectfully submitted,

RICHARD L. DURBIN, JR.
Acting United States Attorney

By:   /s/ John J. LoCurto

JOHN J. LoCURTO
Assistant United States Attorney
Texas Bar No. 24073750
601 N.W. Loop 410, Suite 600
San Antonio, Texas  78216
Tel:  (210) 384-7362
Fax:  (210) 384-7322
Email:  john.locurto@usdoj.gov

*Attorneys for the United States of America*

60