**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* Lisa Wheeler,<br><br>Plaintiff,<br><br>v.<br><br>UNION TREATMENT CENTERS, LLC, *et al.*,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civ. A. No. SA:13-cv-4-XR |

---

**UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS GARRY CRAIGHEAD AND CCM&D CONSULTING, LLC**

---

JOHN F. BASH
United States Attorney

JOHN J. LoCURTO
Assistant United States Attorney
Texas Bar No. 24073750
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7362
Fax: (210) 384-7322
Email: john.locurto@usdoj.gov

*Attorneys for Plaintiff*
*United States of America*

The United States moves for partial summary judgment against defendants Garry Craighead ("Craighead") and CCM&D Consulting, LLC ("CCM&D") on Count Two of the Complaint in Intervention ("Complaint"). (Dkt. #26.)[1] Craighead orchestrated a multi-million dollar scheme to defraud the federal workers' compensation program ("FECA program") administered by the United States Department of Labor, Office of Workers' Compensation Programs ("DOL-OWCP"). He used CCM&D to perpetrate the scheme by, among other things, soliciting and receiving kickbacks on his behalf.

On December 4, 2015, Craighead pleaded guilty to defrauding the FECA program by making patient referrals in return for kickbacks and to laundering the proceeds of his crimes. *United States v. Garry Wayne Craighead*, no. A:15-cr-348-SS (W.D. Tex.) (Dkt. #14.) The Court sentenced him to 14 years in prison and imposed $17.9 million in restitution. (*Id.* Dkt. #76.) In his plea, Craighead admitted to executing several kickback schemes, including an illegal prescription referral deal with pharmacists Brian Haney ("Haney"), who operated Vidor Pharmacy ("Vidor"), and Kevin Gray ("Gray"), who operated Family Pharmacy ("Family").

The scheme was deceptively simple: (1) Haney and Gray agreed to pay Craighead for prescriptions; (2) in return, Craighead agreed to refer FECA patient prescriptions to Vidor and Family pharmacies; (3) the pharmacies billed the FECA program for the prescriptions they allegedly filled for Craighead's patients; and (4) Haney and Gray paid Craighead, through CCM&D, a percentage of the funds the pharmacies received from DOL-OWCP for filling the prescriptions. Between November 30, 2011 and January 2, 2014, Haney and Gray paid Craighead over $800,000 in kickbacks. Craighead admitted these facts in his plea agreement, and swore to their accuracy in court.

[1]CCM&D is *pro se* and technically remains in default. (Dkt. #159.)

In separate criminal cases, Haney and Gray pleaded guilty to paying kickbacks and filing false tax returns. *See United States v. Brian David Haney*, no. 1:16-cr-324-SS (W.D. Tex.) (Dkt. #7); *United States v. Kevin Michael Gray*, no. 1:17-cr-84-SS (W.D. Tex.) (Dkt. #13). They acknowledged funneling over $800,000 to Craighead for prescriptions, which their pharmacies billed to the FECA program. DOL-OWCP paid Vidor and Family at least $3.4 million for the drugs they allegedly dispensed to Craighead's patients. Haney and Gray used this revenue to fund more kickbacks to Craighead and split the remaining profits.

This cash-for-referrals scheme caused DOL-OWCP to spend millions on tainted claims that were ineligible for reimbursement and should not have been paid. The United States seeks partial summary judgment to hold Craighead and CCM&D accountable for their role in the scheme and the damage it wrought on the FECA program.[2] Specifically, the United States moves for summary judgment on Count Two of the Complaint, which alleges that Craighead and CCM&D caused Haney, Gray, and their pharmacies to present false claims for payment in violation of the False Claims Act ("FCA"). (Dkt. #26 ¶¶208-10; 219-34, 239-42.) Craighead's criminal conviction establishes the facts necessary for FCA liability; the Haney and Gray convictions, and their supporting declarations, corroborate those facts and create an indisputable basis for partial summary judgment and treble damages under the FCA.[3]

---

[2]The United States is pursuing a separate FCA suit against Haney, Gray, their pharmacies, and other defendants in Austin, where Haney and Gray were prosecuted. *See United States v. Haney, et al.*, no. 1:17-cv-1125-SS (W.D. Tex.)

[3]The United States earlier moved for default judgment on all claims against Craighead and CCM&D (Dkt. #154), but confines this motion to Count Two. Should the Court grant this motion, the United States intends to dismiss the rest of its case against Craighead and CCM&D on the ground that any additional judgment against them is probably uncollectible due to Craighead's prison sentence, restitution debt, and other liabilities.

## LEGAL FRAMEWORK

### I. SUMMARY JUDGMENT

Summary judgment is warranted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is "genuine" if a reasonable jury could review the evidence and find for the nonmoving party. *Anderson*, at 248. A fact is "material" if it could "affect the outcome of the suit under the governing law." *Id.* A party may move for summary judgment at any time. Fed. R. Civ. P. 56(b).

### II. FECA PROGRAM

The Federal Employees' Compensation Act, 5 U.S.C. §§ 8101 to 8152 ("FECA"), established the FECA program, a workers' compensation program for federal employees who suffer job-related injuries. The program covers millions of postal and federal civilian employees. *See* 5 U.S.C. § 8101(1) (defining covered employees); 39 U.S.A. § 1005(c) (applying FECA to postal workers). FECA defrays an injured worker's medical and rehabilitation expenses, including the cost of prescription drugs. *See, e.g.*, 5 U.S.C. §§ 8102, 8103; 20 C.F.R. §§ 10.0(b), 10.310. DOL-OWCP administers the FECA program and uses federal funds to pay for covered services. *See* 5 U.S.C. § 8147(a); 20 C.F.R. § 10.1.

### III. FALSE CLAIMS ACT

The FCA is a bulwark against fraud on government programs. The statue imposes treble damages and civil penalties on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).[4] The elements

[4]For purposes of this case, the civil penalty for violating the False Claims Act is $5,500 to $11,000 per violation. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(9).

of an FCA cause of action are: (1) a false claim, (2) made with the requisite scienter, (3) that was material, and (4) caused the government to make payment. *See United States ex rel. Longhi v. Lithium Power Tech., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009).[5]

The FCA requires knowing conduct. The statute defines the terms "knowing" and "knowingly" to mean actual knowledge, deliberate ignorance, or reckless disregard. 31 U.S.C. § 3729(b)(1). The FCA does not require "proof of specific intent to defraud." *Id.*

The FCA also requires materiality. The statute defines the term "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

The FCA's core element is a false claim. The statute defines the term "claim" as:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2). A claim may be false for numerous reasons, including that it arose from a violation of the Anti-Kickback Statute ("AKS").

---

[5] Payment is often listed as an element, but payment is not required to establish an FCA violation. The FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *Longhi*, 575 F.3d at 467 (internal quotation omitted). The government may bring suit even if it has not paid anything on a false claim. *United States v. Ridgelea State Bank*, 357 F.2d 495, 497 (5th Cir. 1966).

## IV. ANTI-KICKBACK STATUTE

The AKS makes it a crime to pay for patient referrals or to receive payment in exchange for making a referral:

> (1) [W]hoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> > (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . .
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
> (2) [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . .
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Actual knowledge of the AKS or specific intent to violate the statute is not required. 42 U.S.C. § 1320a-7b(h).

The AKS applies to federal health care programs, defined as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of Title 5)." 42 U.S.C. § 1320a-7b(f). A claim for payment submitted to a federal health care program that includes services or items resulting from a kickback is a false claim as a matter of law and subjects the billing party to liability for treble damages and civil penalties under the FCA. 42 U.S.C. § 1320a-7b(g).

**UNDISPUTED MATERIAL FACTS**

The United States incorporates the attached Appendix ("App.") and exhibits pursuant to Local Rule CV-7(d)(1). The material facts are these:

This case arises from a sprawling health care fraud scheme conceived and executed by Garry Craighead, a former chiropractor and entrepreneur. Craighead ran a group of health care companies, including medical and rehabilitation clinics that did business under the name "Union Treatment Center" or "UTC." (App. ¶19.) With locations in Austin, Killeen, San Antonio, and Corpus Christi, UTC specialized in treating workplace injuries and targeted a specific patient population: unionized federal workers covered by FECA. (*Id.* ¶¶19-22.) Craighead used CCM&D, his marketing company, to court the unions and their officials into steering their members to his clinics. (*Id.* ¶22.) His relationship with the unions helped him maintain a stable federal patient population and ensured a steady flow of new customers. (*Id.*)

Craighead wielded his authority to enrich himself. (*Id.* ¶¶23-34.) His dominion over the clinics gave him power to control patient referrals. (*Id.*) He used this power to make money. (*Id.*) Craighead chose where to refer his patients for services – including surgeries, specialty procedures and diagnostics, and pharmacy services – in return for kickbacks. (*Id.*) To obtain a referral from UTC or his other businesses, a provider had to pay Craighead a cut of the revenue the referral produced. (*Id.* ¶¶ 24, 42, 49-50.) In this way, Craighead monetized his patients and profited from all aspects of their care, even those his clinics did not render. (*Id.* ¶¶24, 26.)

CCM&D played a central role in the scheme. (*Id.* ¶25.) The company negotiated unlawful patient referral deals with Craighead's chosen providers; directed patients to those providers; and received kickbacks for Craighead. (*Id.* ¶¶25, 52.) Craighead controlled

CCM&D's bank account and personally profited from the payments the company solicited and received on his behalf. (*Id.* ¶¶51-53.)

Craighead and CCM&D victimized the FECA program. (*Id.* ¶24.) They knowingly and willfully solicited and received kickbacks in return for referring patients covered by FECA. (*Id.*) Their chosen providers billed the FECA program and received millions from DOL-OWCP, out of which they paid Craighead his take. (*Id.*¶¶24, 42, 50.) The scheme thrived from 2008 to 2015 and netted Craighead over $17 million in kickbacks from more than a dozen parties. (*Id.* ¶26.)

One of these kickbacks deals involved prescription drugs. Specifically, in September, 2011, Craighead brokered an agreement with Haney and Gray under which (1) Craighead agreed to send his FECA patient prescriptions to Vidor and Family pharmacies; (2) the pharmacies would bill the FECA program; and (3) Haney and Gray would pay Craighead, through CCM&D, a percentage of the funds DOL-OWCP reimbursed the pharmacies for the drugs they allegedly dispensed to Craighead's patients. (*Id.* ¶¶38-42.)

The parties' kickback scheme lasted from September 2011 to January, 2014, and cost the United States millions. (*Id.* ¶ 44.) During this time, Craighead referred hundreds of UTC patients to Vidor and Family; in return for the referrals, Haney and Gray paid Craighead monthly kickbacks totaling $813,560.67. (¶¶ 44-45, 50-52.) They made the payments to CCM&D by check or wire transfer based on the revenue the referrals generated. (*Id.* ¶¶38-42.) For example, on December 21, 2011, Vidor and Haney cut CCM&D a check totaling $18,072.47 for "November" referrals:

VIDOR PHARMACY LLC
305 S ARCHIE ST
VIDOR, TX 77662-4840

20130

DATE 12/21/11

PAY TO THE ORDER OF CCM + D $ 18,072.47

Eighteen thousand seventy-two and 47/100 DOLLARS

Wells Fargo Bank, N.A.
Texas
wellsfargo.com

FOR November

⑈0000020130⑈

(*Id.* ¶50-51.) Haney and Gray routed all of the payments to CCM&D, except for the final kickback, which they deposited directly into Craighead's personal account. (*Id.* ¶52.) Craighead used the payments to fund his lavish lifestyle. (*Id.* ¶53; *see also id.* ¶4.)

Based on the referrals from Craighead, Vidor and Family submitted to the FECA program nearly 12,000 false claims for payment. (*Id.* ¶¶45-48.) DOL-OWCP paid Vidor and Family at least $3,478,208.15 for the referred prescriptions, none of which were eligible for reimbursement. (*Id.* ¶49.)

The United States prosecuted Craighead, Haney, and Gray, among others, for their roles in several kickback schemes. On December 4, 2015, Craighead pleaded guilty to defrauding the FECA program by taking kickbacks in violation of 42 U.S.C. § 1320a-7b(b) and to laundering the proceeds of his crimes in violation of 18 U.S.C. § 1957. (*Id.* ¶¶1-2, 15-16.) The Court sentenced him to 14 years in prison and ordered him to repay $17,908,170, the total amount of illegal remuneration he received. (*Id.* ¶¶10-12.) In the factual statement supporting his guilty plea, Craighead admitted that as part of the scheme he aided, abetted, and caused health care providers, including Haney and Gray, to present false claims to the FECA program. (*Id.* ¶24.)

On December 14, 2016, Haney pleaded guilty to paying kickbacks to Craighead in violation of 42 U.S.C. § 1320a-7b(b)(2), and to filing a false income tax return violation of 26

U.S.C. § 7206(1). (*Id.* ¶31-32.) Gray pleaded guilty to like charges on April 13, 2017. (*Id.* ¶¶33-34.) The Court sentenced Haney and Gray to 28-month prison terms and ordered them to repay $813,560, the amount they paid Craighead in kickbacks. (*Id.* ¶¶35-37.)

**DISCUSSION**

The United States seeks partial summary judgment on Count Two of the Complaint, which alleges, among other things, that Craighead and CCM&D caused Vidor and Family to submit false claims to the FECA program. (Dkt. #26 ¶¶219-34, 239-242.)

## V. CRAIGHEAD AND CCM&D CAUSED VIDOR AND FAMILY TO SUBMIT FALSE CLAIMS TO THE FECA PROGRAM.

Craighead is liable for the tainted claims that Vidor and Family presented to the FECA program, even though he did not personally submit them. The FCA imposes liability on any person who knowingly submits a false claim or causes another person to submit a false claim. 31 U.S.C. § 3729(a)(1)(A); *see also Peterson v. Weinberger*, 508 F.2d 45, 52-53 (5th Cir. 1975) (observing that FCA reaches anyone who knowingly assists conduct that causes government to pay a false claim); *Universal Health Svc., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (noting FCA reaches anyone who induces submission of false claim). A person causes another to violate the FCA if it is foreseeable that the person's conduct will result in the submission of a false claim to the government. *See United States v. Vascular Solutions, Inc.*, 2013 WL 12330556, at *4 (W.D. Tex. March 7, 2013); *United States ex rel. Franklin v. Parke-Davis*, 2003 WL 22048255, at *4-6 (D. Mass. Aug. 22, 2003); *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008) (noting that defendant is responsible for "natural, ordinary and reasonable consequences of his conduct").

Vidor and Family submitted to the FECA program nearly 12,000 claims based on referrals from Craighead and his companies. (App. ¶48.) Every one of their claims was false as

a matter of law because the claims arose from and were tainted by the kickbacks that Haney and Gray paid Craighead for the referrals. 42 U.S.C. § 1320a-7b(g). In his guilty plea, Craighead admitted that he aided, abetted, and caused Vidor and Family, among others, to submit false claims to the FECA program. (*Id.* ¶24.)

But even if Craighead had not specifically admitted to causing the submission of false claims, the facts demonstrate that he and CCM&D did so. Craighead, Haney, and Gray targeted the FECA program. (App. ¶¶38-42.) Craighead agreed to sell his FECA patient prescriptions to Vidor and Family. (*Id.* ¶39.) Haney and Gray agreed to pay Craighead, through CCM&D, a percentage of the amount that DOL-OWCP reimbursed the pharmacies for the prescriptions. (*Id.* ¶42.) CCM&D agreed to receive the tainted funds for Craighead. (*Id.* ¶¶51-52.) The parties knew that the FECA program covered and would pay for the referred prescriptions; indeed, that was the point of their scheme. (*Id.* ¶¶41-42.) The pharmacies' submission of false claims was the natural and foreseeable result of this agreement and the actions Craighead and CCM&D took to advance the scheme. *Compare Vascular Solutions*, 2013 WL 12330556 at *4 (finding foreseeability where government alleged that marketing scheme directed at Medicare and TRICARE would cause providers to submit claims to those programs).

The false claims that Craighead and CCM&D caused Vidor and Family to submit were material. An affirmative false statement or omission is material if it has the potential to influence the government's payment decision. *Id.* at *5. "[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Escobar*, 136 S. Ct. at 2003.

A claim that arises from a kickback is false and ineligible for reimbursement. 42 U.S.C. § 1320a-7b(g). Had it known that the pharmacies' prescription claims were tainted by the kickback scheme at issue, DOL-OWCP would not have paid them. (App. ¶55.) The failure to inform DOL-OWCP that the claims violated the AKS was a material omission that meets the FCA's materiality standard. *Escobar*, 136 S. Ct. at 2003; *see also United States v. Rogan*, 517 F.3d 449, 451-52 (7th Cir. 2008) (discussing materiality in case involving kickbacks and other illegal referrals).

## VI. CRAIGHEAD IS COLLATERALLY ESTOPPED FROM DENYING THE KICKBACK SCHEME WITH VIDOR AND FAMILY.

A criminal conviction collaterally estops a defendant from re-litigating an issue in a subsequent civil case based on the same facts. *See United States v. Thomas*, 709 F.2d 968, 972 (5th Cir. 1983). "Because of the existence of a higher standard of proof and greater procedural protection in a criminal prosecution, a conviction is conclusive as to an issue arising against the criminal defendant in a subsequent civil action." *Thomas*, 709 F.2d at 972; *see also Tomlinson v. Lefkowitz*, 334 F.2d 262, 264 (5th Cir. 1964). Collateral estoppel has three elements: (1) the issue in the two cases must be the same; (2) the issue was actually litigated and resolved in the prior case; and (3) resolution of the issue was a necessary to the outcome of the prior case. *See Wehling v. Columbia Broadcasting System*, 721 F.2d 506, 508 (5th Cir. 1983); *Tomlinson*, 334 F.2d at 264. The doctrine applies whether the criminal conviction is premised on a jury verdict or a guilty plea. *Brazzell v. Adams*, 493 F.2d 489, 490 (5th Cir. 1974); *United States v. Killough*, 848 F.2d 1523, 1528 (11th Cir.1988).

Congress incorporated these principles into the FCA itself:

> [A] final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo

> contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730 [of the FCA].

31 U.S.C. § 3731(e). The FCA's estoppel provision prevents a convicted criminal defendant from escaping civil liability for the same misconduct. *See United States v. City Nursing Services of Texas*, 2016 WL 320766, *3 (S.D. Tex. Jan. 27, 2016); *United States v. Boutte*, 907 F. Supp. 239, 241-42 (E.D. Tex. 1995), *aff'd*, 108 F.3d 332 (5th Cir. 1997).

In his plea, Craighead admitted to devising and executing a scheme to defraud the FECA program by (1) knowingly and willfully soliciting and receiving kickbacks from Haney and Gray in exchange for making referrals to their pharmacies, and (2) aiding, abetting, and causing the pharmacies' submission of false claims that would be paid for by DOL-OWCP. (App. ¶¶24, 38-42.) These admissions formed the basis of Craighead's conviction and they are identical to the issues in this case. Craighead is therefore collaterally estopped from denying these facts and the FCA liability that flows from them.

Furthermore, while the Haney and Gray convictions are not binding on Craighead in the same way as his own, their respective declarations corroborate the existence and details of the kickback scheme. (App. ¶¶31-52.) Their declarations also reveal the damage the scheme caused, and provide compelling summary judgment evidence.

## VII. DAMAGES

When a false claim causes the United States to pay for an ineligible service, the damage to the government is the full amount paid. *See Weinberger*, 508 F.2d at 52 (holding that damage in FCA case was amount paid, even though service was rendered, because service was not reimbursable). The kickback-tainted claims at issue were false and ineligible for reimbursement as a matter of law. 42 U.S.C. § 1320a-7b(g). Thus, in this case, the United States' injury is the

entire amount that DOL-OWCP paid out on the tainted claims. *See Rogan*, 517 F.3d at 453 (holding that damages equaled amount paid on tainted claims); *United States ex rel. Freedman v. Suarez-Hoyos*, 2012WL 4344199, at *5 (M.D. Fla. 2012) (holding "the amount of the Government's damages resulting from the payment of false claims tainted by a kickback arrangement equals the full amount that Medicare paid on such claims").[6]

The evidence shows that DOL-OWCP paid Vidor and Family at least $3,478,208.15 on the claims that Craighead referred to them. (App. ¶49.) This amount represents the government's damage in this case.[7] The government's damage is subject to mandatory trebling under the FCA. 31 U.S.C. § 3729(a). Accordingly, the United State is entitled to partial summary judgments against Craighead and CCM&D in the amount of $10,434,624.45.[8]

---

[6]The FCA does not contain a specific damages formula. Courts have adopted other approaches to calculating the government's damages, but those approaches are distinguishable. For example, in *United States v. Harris*, 821 F.3d 589, 604-05 (5th Cir. 2016), the Fifth Circuit held that the loss in a criminal case equaled the contract price *less* the value of the services the defendant's company rendered. The Fifth Circuit based its decision on the sentencing guidelines, which directed the court to calculate loss by accounting for the fair market value of the rendered service. *Id.* at 605. There are no comparable guidelines in FCA cases, and the remedy at issue here (civil monetary award vs. prison sentence) is distinct. The decision in *United States v. Mahmood*, 2016 WL 5369562, at *4 (E.D. Tex. Sept. 26, 2016) is another example. *Mahmood* involved upcoding, which involves manipulation of the codes used to bill the government for a rendered service. *Id.* The service in *Mahmood* was actually provided and eligible to be paid; the fraud was in the overstatement of the amount due. The District Court held that the damage in *Mahmood* was the difference between the billed amount and the value of the rendered service. *Id.* This case is distinguishable because, unlike *Mahmood*, no portion of the claims at issue was eligible for reimbursement. Thus, the damage is the full amount paid.

[7]The United States submits certified claims data with this motion. The data show that DOL-OWCP paid over $3.6 million on tainted claims. (App. ¶49 n.4.) For purposes of this motion, the United States limits its damages figure to $3,478,208.15, which is the amount of reimbursement that Haney and Gray admitted to receiving for the Craighead prescriptions.

[8]The United States is also entitled to civil penalties for each violation of the statute – which in this case approaches 12,000 violations – but does not seek them at this time. Should the Court deny this motion, the United States reserves its right to seek penalties for each false claim Craighead and CCM&D caused the pharmacies to submit.

**CONCLUSION**

The United States respectfully requests that the Court grant partial summary judgment on Count Two of the Complaint against Garry Craighead and CCM&D.

Date: July 25, 2018

Respectfully submitted,

JOHN F. BASH
United States Attorney

By: */s/ John J. LoCurto*

JOHN J. LoCURTO
Assistant United States Attorney
Texas Bar No. 24073750
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7362
Fax: (210) 384-7322
Email: john.locurto@usdoj.gov

*Attorneys for Plaintiff
United States of America*

**CERTIFICATE OF SERVICE**

I certify that, on July 25, 2018, I electronically filed the United States' Motion for Partial Summary Judgment against Garry Craighead and CCM&D Consulting, LLC, along with a supporting Appendix, attachments, and proposed order, through the Court's ECF system, which caused a notice of electronic filing to be served on counsel of record in this case. I further certify that I caused copies of the foregoing papers to be served by REGULAR MAIL as follows:

Garry Wayne Craighead
62952-380
FCI Bastrop
P.O. Box 1010
Bastrop, TX 78602

Christine Craighead
c/o Jose I. Gonzalez-Falla
Federal Public Defender
Lavaca Plaza
504 Lavaca St., Ste 960
Austin, TX 78701

/s/ *John J. LoCurto*
JOHN J. LoCURTO
Assistant United States Attorney