UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

GARRY WAYNE CRAIGHEAD,      )
                             )
                             )
          Movant,            )
                             )
                             )
V.                           )   CIVIL NO.    A-17-CA-916-SS
                             )   CRIMINAL NO. A-15-CR-348-SS
                             )
UNITED STATES OF AMERICA,     )
                             )
                             )
          Respondent.        )

GOVERNMENT RESPONSE TO MOTION TO VACATE, SET ASIDE,
OR CORRECT SENTENCE PURSUANT TO TITLE 28 U.S.C. § 2255

The United States of America, by and through the United
States Attorney for the Western District of Texas, files this
response to Movant Garry Wayne Craighead's Motion to Vacate, Set
Aside or Correct Sentence pursuant to Title 28 U.S.C. § 2255.

The motion, which alleges that two successive retained
attorneys provided constitutionally ineffective assistance of
counsel, is without merit and should be denied without an
evidentiary hearing.

PROCEDURAL HISTORY

On December 4, 2015, Defendant Garry Wayne Craighead,
accompanied by retained attorneys James Bell and Jim Lacey,
waived indictment and, pursuant to a plea agreement, pled guilty
to a two count superseding information charging willful

solicitation and receipt of illegal remuneration in connection with Federal healthcare claims in violation of 42, U.S.C. 1320a-7b(b) (count one) and engaging in a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. 1957 (count two).  The guilty plea was proceeded by approximately four months of discovery, discussions, and plea negotiations between Craighead's attorneys and the government.

On December 14, 2015, pursuant to the cooperation provisions of his plea agreement, Craighead, his counsel, and a team of former federal agents hired by Craighead's counsel sat down with government investigators and began a series of meetings in which Craighead and his team cooperated by describing his multi-year participation in unlawful healthcare kickback schemes and describing how he could assist government investigators.  Craighead's cooperation continued until February 2016.

On March 1, 2016, the government filed a motion to revoke Craighead's bail alleging that Craighead committed felonies while on bail and failed a drug test.

On March 7, 2016, United States Magistrate Judge Andy Austin conducted an evidentiary hearing and granted the government motion to revoke bail.  Craighead was represented by James Bell at the hearing.

On March 23, 2016, Craighead moved to dismiss counsel James

Bell and replace him with attorney Olga Seelig.

On March 24, 2016, the Court granted Craighead's motion to substitute Olga Seelig as his counsel. James Bell was discharged by the Court.

On March 25, 2016, psychologist William A. Dailey, Ph.D., examined Craighead at the request of Olga Seelig (Document 57-1, page 1).

On March 30, 2016, attorney Jeff Senter entered an appearance as Craighead's counsel, in addition to Olga Seelig.

On March 31, 2016, Craighead moved to continue his scheduled April 22, 2016 sentencing.

On April 4, 2016, the Court continued Craighead sentencing until June 10, 2016.

On April 22, 2016, psychiatrist Dr. Robert Cantu, M.D., examined Craighead (Document 67, page 3).

On June 2, 2016, Craighead filed a "Notice to Court of Possible Mental Health Issue and Motion to Determine Competency" including a June 2, 2016 report of Dr. Robert E. Cantu, M.D., and an undated report by William A. Dailey, Ph.D., related to his March 25, 2016 examination of Craighead. The pleading cited statutes authorizing the Court to delay proceedings and order psychiatric and psychological examinations.

On June 9, 2016, the Court entered an order denying a continuance of Craighead's June 10, 2016 sentencing.

On June 10, 2016, Craighead filed a pleading styled
"Defendant's Withdrawal of Plea and Request for Trial."
Craighead said he felt he made a mistake in following his
previous counsel's advice to plead guilty and cooperate with the
government, he felt misled by his prior counsel, and he pled
guilty to crimes of which he was not guilty.

On June 10, 2016, the Court conducted a hearing on
Craighead's motion to withdraw guilty plea.  Craighead called
Dr. Robert E. Cantu, M.D., who testified that at the time of his
April 22, 2016 examination of Craighead, Craighead was competent
to stand trial (Transcript at 16).  When asked by Craighead's
counsel whether Craighead was competent to enter into the
December 4, 2015 plea agreement, Cantu said he had previously
rendered an opinion that he did not believe Craighead was
competent at that time to enter into the plea agreement(Page
16).  When Cantu was asked if Craighead was competent now to
enter knowing and intelligent acts, Cantu answered, "With the
appropriate support from his legal staff, yes."  The Court
denied Craighead's motion to withdraw guilty plea.

Later, on June 10, 2016, Craighead was sentenced on count
one to serve sixty months confinement to be followed by a three
year supervised release term, to pay $17,908,170 in restitution,
and to pay a $100 special assessment.  On count two, Craighead
was sentenced to serve 108 months confinement to be followed by

4

a three year term of supervised release, to pay the same $17,908,170 in restitution imposed on count one, and to pay a $100 special assessment. The Court ordered the terms of confinement to run consecutively and the terms of supervised release to run concurrently.

On June 22, 2016, Craighead filed a notice of appeal, but subsequently moved to dismiss the appeal. The Court granted the dismissal motion on September 22, 2016.

On September 21, 2017, Craighead filed this 2255 action.

<u>STATEMENT OF THE FACTS</u>

On December 4, 2015, Craighead, under oath, told the United States Magistrate Judge that he read the entire statement of facts included in his plea agreement, that he had gone over it carefully with his attorney, and that he understood the statement of facts. Later, after having been reminded by the Magistrate Judge that he was testifying under oath, Craighead reaffirmed that the statement of facts was accurate. The statement of facts was as follows.

1. The <u>Federal Bureau of Prisons</u> (BOP), a component of the Department of Justice, operated prisons and community based facilities that confined prisoners convicted in Federal courts. Several BOP prisons were located in the State of Texas. BOP provided work related health care to employees under a Federal health care benefit program administered by the Department of

Labor, Office of Workers' Compensation Programs.

2. <u>Corpus Christi Army Depot</u> (Army) was a United States Army installation located in Corpus Christi, Texas, that overhauled and repaired helicopters, engines and components. The 3,000 plus civilian employees were provided work related health care under a Federal health care benefit program administered by the Department of Labor, Office of Workers' Compensation Programs.

3. The <u>United States Department of Veterans Affairs</u> (VA) was a department of the United States that administered military veteran benefit systems and operated approximately 1700 health care facilities. VA provided work related health care to employees under a Federal health care benefit program administered by the Department of Labor, Office of Workers' Compensation Programs.

4. The <u>United States Postal Service</u> (Postal) was an independent establishment of the executive branch of the United States government. Postal provided work related health care to employees under a Federal health care benefit program administered by the Department of Labor, Office of Workers' Compensation Programs.

5. The <u>United States Border Patrol</u> (Border Patrol), a component of the Department of Homeland Security, was a law enforcement agency whose mission was to detect and prevent the

6

flow of illegal immigrants and contraband across the
international border.  The Border Patrol provided work related
health care to employees under a Federal health care benefit
program administered by the Department of Labor, Office of
Workers' Compensation Programs.

6.  The Office of Workers' Compensation Programs (Labor) in
the Department of Labor (the Office of Workers' Compensation
Programs and the Department of Labor hereafter are referred to
collectively as Labor) administered the Federal Employees'
Compensation Act which provided workers' compensation benefits
to civilian employees of the United States who suffered job
related injuries.  The benefits included medical and
rehabilitation expenses.  Federal funds were used to pay
doctors, physical therapists, hospitals, pharmacies, suppliers
of medical goods, and other enrolled providers.  Claims for
injured worker health care were initially paid by Labor which
then billed the employing federal agency for the cost of
benefits provided to the worker plus an administrative fee.
Programs administered by Labor that paid medical and
rehabilitation expenses under the Federal Employees'
Compensation Act were Federal health care benefit programs.  A
substantial number of the employees covered by the workers'
compensation programs were union members.

7.  Defendant Garry Wayne Craighead was a chiropractor who,

from 2008 until 2015, organized and involved himself in a number of health care related entities that derived substantial revenue from health care claims filed with Labor's workers' compensation programs. The entities were Union Treatment Centers, LLC, Union Treatment Center clinics in Austin, Killeen, San Antonio, and Corpus Christi, New Help clinics in Dallas and Fort Worth which were later marketed as Union Treatment Center and even later marketed as GreenTree Health, a Weslaco, Texas clinic marketed as GreenTree Health, Creekside Surgical, PLLC, Creekside Diagnostics, LLC, CCM&D Consulting, LLC, Creekside Practice Management, LLC, GreenTree Health, and Greentree Health Services, Inc..

8. <u>Union Treatment Centers, LLC</u>, (UTC) was an Austin, Texas, business in the Western District of Texas that operated clinics in Austin, Dallas, Fort Worth, Killeen, San Antonio, and Corpus Christi under the Union Treatment Center name. On May 15, 2008, Defendant Craighead transferred ownership of UTC to his father-in-law, but involved himself in UTC operations until December 2013 when Craighead's involvement ended.

9. <u>New Help</u> was the original name of the two clinics located in Dallas and Fort Worth. In October 2011, Defendant Craighead, through a company formed and owned in the name of Craighead's daughter, acquired the New Help clinics. After operating the clinics under the New Help name for a brief time,

8

Craighead re-branded the clinics under the UTC name, then operated the clinics as Greentree Health.

10. Creekside Diagnostics, LLC, and Creekside Surgical, PLLC, (hereafter referred to collectively as Creekside and/or the Creekside entities) were companies engaged in the practice of medicine. Texas law prohibited non-physicians from owning, controlling, and profiting from companies that employed physicians in the practice of medicine. The Creekside entities were formed at the direction of Defendant Craighead by the medical doctor director of UTC, who acted as Craighead's proxy. Creekside Surgical hired contract physicians to treat UTC patients and to refer them for surgical consults and procedures. Creekside Diagnostics hired physicians to examine UTC patients who had been referred for testing. Each Creekside company was enrolled with Labor as a provider and operated within the Western District of Texas.

11. CCM&D Consulting, LLC (CCM&D), was Defendant Craighead's marketing/consulting company through which he solicited federal employees to utilize health care providers recommended by Defendant Craighead, referred federal employees to certain health care providers, negotiated patient referral agreements with certain health care providers, and received illegal remuneration payments from the health care providers. CCM&D operated in Austin in the Western District of Texas

9

12. Creekside Practice Management, LLC, was a company formed on December 16, 2011 that Defendant Craighead used to take over and perform the functions of CCM&D because of Internal Revenue Service collection actions against CCM&D. Creekside Practice Management, LLC, operated in Austin in the Western District of Texas.

13. GreenTree Health was a company Defendant Craighead utilized to brand and market the Dallas, Fort Worth, and Weslaco clinics after his December 2013 departure from UTC. Greentree Health operated in Austin in the Western District of Texas.

14. Greentree Health Services, Inc. was a company formed by Defendant Craighead on October 29, 2014 that operated in Austin in the Western District of Texas.

15. Defendant Craighead, individually and through CCM&D, Creekside Practice Management, LLC, Greentree Health, and Greentree Health Services, Inc., courted employees of BOP, Army, VA, Postal, Border Patrol, and other federal agencies, their union leaders, and their unions to utilize clinics recommended by him. As a result, the clinics developed and maintained a substantial flow of federal employee patients insured by Labor's health care benefit programs. Defendant Craighead's influence with the clinics empowered him to refer the federally insured employee patients to other health care providers of his choosing, including surgical clinics, doctor specialists,

10

pharmacies, and hospitals.

16. Defendant Craighead devised a scheme to defraud Labor's workers' compensation health care benefit programs for federal workers by knowingly and willfully soliciting and receiving illegal remuneration from health care providers in return for referring federally insured worker patients for goods, services, and items that would be paid for by Labor's workers' compensation health care benefit programs in violation of Title 42, United States Code, Section 1320a-7b(b)(1), by causing the health care providers to offer and pay the remuneration in violation of Title 42, United States Code, Section 1320a-7b(b)(2), and by aiding, abetting, and causing the health care providers to file false claims with Labor's workers' compensation health care benefit programs in violation of Title 18, United States Code, Section 287, which claims were false because they resulted from violations of Title 42, United States Code, Section 1320a-7b(b).

17. As a part of the scheme, Defendant Craighead:

a. Made illegal remuneration agreements with certain health care providers and their owners and operators, including, but not limited to:

(1) UTC and the Creekside entities;

(2) Vidor Pharmacy, LLC, and Family Pharmacy, Inc.;

11

(3)    Forest  Park Medical Center, LLC;

(4)    Victory Medical Center Southcross, LP, aka
Innova Hospital San Antonio, LP;

(5)    Willow Creek Surgery Center, LP, First
Surgical Partners, LLC, and First Street Hospital, LP;

(6)    Dynacq Healthcare, Inc., Doctor's Practice
Management, Inc., Vista Hospital of Dallas, LLP, aka
Surgery Specialty Hospitals of America Dallas, and
Vista        Land and Equipment;

(7)    Randal Irving Corporation aka Gibson
Pharmacy, E.S. Drugs, Inc. aka Gibson Pharmacy;

(8)    Anti-Aging Management and Research,
Inc., Public Express, Inc. dba Piney Point Pharmacy;

(9)    Texas Diagnostic Center, Inc.; and

(10)    Hope Pharmacy, Inc.;

b.    Referred the federally insured worker patients to
health care providers that agreed to pay illegal
remuneration;  and

c.    Solicited and received regular and periodic
payments of the illegal remuneration amounting to millions
of dollars.

18.   As a part of the scheme, the health clinics,
hospitals, surgical facilities, pharmacies, other providers of
health care, and their owners and operators:

a. Agreed to pay illegal remuneration to Defendant Craighead for patient referrals;

b. Filed false claims with Labor's workers' compensation health care benefit programs for federally insured worker patients referred by Defendant Craighead because of violations of Title 42, United States Code, Section 1320a-7b(b), and collected payments from Labor; and

c. Paid portions of the money obtained from Labor to Defendant Craighead as illegal remuneration in violation of Title 42, United States Code, Section 1320a-7b(b)in fulfillment of their agreements.

19. As a part of the scheme, beginning in or about the 2008 and continuing until in or about 2015 in the Western District of Texas, Defendant willfully and knowingly did solicit and receive remuneration, directly and indirectly, overtly an covertly, in the amounts of cash set forth below: (a) in return for referring individuals to persons and entities named in paragraph 17 above for the furnishing and arranging for the furnishing of items and services for which payment could be made in whole and in part under Federal health care programs administered by the Department of Labor, Office of Workers Compensation Programs, and (b) in return for arranging for and recommending purchasing, leasing, and ordering goods, facilities, services, and items for which payment could be made

in whole and in part under Federal health care programs administered by the Department of Labor, Office of Workers Compensation Programs, and the cash payments of remuneration to Defendant and his companies were as follows:

UTC, Creekside Diagnostic,
Creekside Surgical, GreenTree Health

| Date | Remuneration | Source |
|------|-------------|--------|
| 12/30/10 to 02/21/14 | $3,023,959 | Wires from UTC |
| 08/30/11 to 04/14/14 | $1,906,283 | Wires from CS |
| 01/11/11 to 02/23/12 | $2,512,930 | Checks from |
| UTC,CD,CS | | |
| 09/06/11 to 10/02/13 | $  352,802 | Wires from CD |
| 09/03/13 to 11/13/14 | $2,004,000 | Wires from GH |
| 09/03/13 to 01/16/14 | $   35,000 | Wires from GH |
| 12/20/13 | $   41,105 | Wire from UTC |
| | $9,876,079 | |

Vidor Pharmacy, LLC, and Family Pharmacy, Inc.

| Date | Remuneration |
|------|-------------|
| 11/30/11 | $25,226 |
| 12/27/11 | $18,072 |
| 01/19/12 | $16,615 |
| 02/21/12 | $21,307 |
| 03/09/12 | $ 7,908 |
| 03/20/12 | $10,313 |
| 04/13/12 | $18,059 |
| 05/16/12 | $17,493 |
| 06/13/12 | $18,694 |
| 07/11/12 | $23,492 |
| 08/10/12 | $23,578 |
| 09/12/12 | $31,686 |
| 10/18/12 | $40,236 |
| 11/20/12 | $19,408 |
| 12/12/12 | $35,033 |
| 01/14/13 | $29,089 |
| 02/14/13 | $43,364 |
| 03/19/13 | $36,362 |
| 04/16/13 | $33,050 |
| 05/17/13 | $42,743 |

```
06/14/13        $44,794
07/10/13        $40,359
08/15/13        $42,682
09/16/13        $50,979
10/16/13        $49,989
11/15/13        $47,442
01/02/14        $25,576
               $813,549
```

Forest Park Medical  Center, LLC

| Date | Remuneration |
| --- | --- |
| 10/17/11 | $ 50,000 |
| 11/15/11 | $ 50,000 |
| 12/15/11 | $ 50,000 |
| 01/16/12 | $ 25,000 |
|  | $175,000 |

Victory Medical Center Southcross, LP
aka Innova Hospital San Antonio, LP,

| Date | Remuneration |
| --- | --- |
| 12/04/08 | $ 25,000 |
| 01/09/09 | $ 25,000 |
| 02/09/09 | $ 25,000 |
| 03/09/09 | $ 25,000 |
| 04/08/09 | $ 25,000 |
| 05/06/09 | $ 25,000 |
| 06/08/09 | $ 25,000 |
| 07/06/09 | $ 25,000 |
| 08/04/09 | $ 25,000 |
| 08/20/09 | $ 10,000 |
| 09/02/09 | $ 15,000 |
| 09/17/09 | $  6,000 |
| 11/04/09 | $ 25,000 |
| 11/09/09 | $ 20,000 |
| 12/02/09 | $ 25,000 |
| 12/29/09 | $ 20,000 |
| 01/07/10 | $ 45,000 |
| 01/13/10 | $ 20,000 |
| 01/20/10 | $ 10,000 |
| 02/03/10 | $ 45,000 |
| 02/09/10 | $ 20,000 |
| 02/11/10 | $ 10,000 |
| 03/01/10 | $ 45,000 |

| | |
|---|---|
| 03/10/10 | $ 20,000 |
| 04/01/10 | $ 25,000 |
| 04/08/10 | $ 20,000 |
| 04/09/10 | $ 20,000 |
| 04/28/10 | $  5,000 |
| 05/05/10 | $ 25,000 |
| 05/07/10 | $ 25,000 |
| 05/13/10 | $ 15,000 |
| 06/03/10 | $ 40,000 |
| 06/10/10 | $ 25,000 |
| 07/02/10 | $ 25,000 |
| 07/08/10 | $ 25,000 |
| 07/13/10 | $ 15,000 |
| 08/02/10 | $ 25,000 |
| 08/11/10 | $ 20,000 |
| 08/19/10 | $ 20,000 |
| 09/07/10 | $ 25,000 |
| 09/10/10 | $ 15,000 |
| 09/16/10 | $ 25,000 |
| 10/01/10 | $ 25,000 |
| 10/07/10 | $ 35,000 |
| 10/12/10 | $  5,000 |
| 11/01/10 | $ 25,000 |
| 11/02/10 | $ 15,000 |
| 11/05/10 | $ 15,000 |
| 12/02/10 | $ 35,000 |
| 02/09/11 | $ 25,000 |
| 03/01/11 | $ 25,000 |
| 03/11/11 | $ 25,000 |
| 03/12/12 | $ 30,000 |
| 04/05/12 | $ 30,000 |
| 05/01/12 | $ 30,000 |
| 05/17/12 | $ 30,000 |
| 06/06/12 | $ 35,000 |
| 06/07/12 | $ 30,000 |
| 07/17/12 | $ 35,000 |
| 08/22/12 | $ 35,000 |
| 09/18/12 | $ 35,000 |
| 10/10/12 | $ 35,000 |
| 10/23/12 | $ 35,000 |
| 11/13/12 | $ 35,000 |
| 12/03/12 | $ 30,000 |
| 12/12/12 | $ 30,000 |
| 01/07/13 | $ 35,000 |
| 01/16/13 | $ 20,000 |
| 01/23/13 | $ 20,000 |
| 02/05/13 | $ 25,000 |

| Date | Remuneration |
|------|-------------|
| 02/21/13 | $ 25,000 |
| 03/01/13 | $ 25,000 |
| 03/22/13 | $ 32,500 |
| 04/08/13 | $ 30,000 |
| 05/07/13 | $ 25,000 |
| 05/24/13 | $ 20,000 |
| 06/20/13 | $ 35,000 |
| 08/13/13 | $ 20,000 |
| 08/14/13 | $ 32,500 |
| 08/26/13 | $ 25,000 |
| 09/11/13 | $ 35,000 |
| 09/26/13 | $ 35,000 |
| 10/18/13 | $ 30,000 |
| 11/04/13 | $ 35,000 |
| 12/02/13 | $ 30,000 |
| | $2,176,000 |

## Willow Creek Surgery Center, LP.
## First Surgical Partners, LLC, and First Street Hospital, LP

| Date | Remuneration |
|------|-------------|
| 08/31/10 | $ 25,000 |
| 10/04/10 | $ 25,000 |
| 11/01/10 | $ 25,000 |
| 12/01/10 | $ 25,000 |
| 01/05/11 | $ 25,000 |
| 02/01/11 | $ 25,000 |
| | $150,000 |

## Dynacq Healthcare, Inc., Doctor's Practice Management, Inc., Vista Hospital of Dallas, LLP, aka Surgery Specialty Hospitals of America Dallas, and Vista Land and Equipment

| Date | Remuneration |
|------|-------------|
| 04/21/11 | $ 94,500 |
| 06/06/11 | $125,000 |
| 06/14/11 | $ 75,000 |
| 06/27/11 | $ 50,000 |
| 07/19/11 | $ 50,000 |
| 08/03/11 | $ 75,000 |
| 08/15/11 | $ 75,000 |
| 08/31/11 | $ 50,000 |
| | $594,500 |

## Randal Irving Corporation aka Gibson Pharmacy

<u>and E.S. Drugs, Inc. aka Gibson Pharmacy</u>

The dates and amounts of remuneration received by Defendant Craighead from this vendor have not yet been determined.

Anti-Aging Management and Research, Inc.,
<u>Public Express, Inc. dba Piney Point Pharmacy</u>

The dates and amounts of remuneration received by Defendant Craighead from this vendor have not yet been determined.

<u>Texas Diagnostic Center, Inc.</u>

The dates and amounts of remuneration received by Defendant Craighead from this vendor have not yet been determined.

<u>Hope Pharmacy, Inc.</u>

| <u>Date</u> | <u>Remuneration</u> |
|---|---|
| 03/20/15 | $15,000 |
| 04/02/15 | $ 12,000 |
| 04/17/15 | $ 20,099 |
| 04/17/15 | $  5,132 |
| 04/24/15 | $  4,235 |
| 04/30/15 | $ 34,021 |
| 05/08/15 | $118,176 |
| 05/14/15 | $ 31,285 |
| 05/21/15 | $ 46,741 |
| 05/28/15 | $  2,880 |
| 06/05/15 | $ 46,097 |
| 06/12/15 | $  2,826 |
| 06/18/15 | $ 49,386 |
| 06/25/15 | $ 22,018 |
| 07/02/15 | $  1,913 |
| 07/09/15 | $ 91,512 |
| 07/16/15 | $178,209 |
| 07/24/15 | $440,048 |
| 07/30/15 | $448,339 |
| 08/11/15 | $  3,819 |
| 08/17/15 | $118,154 |
| 08/20/15 | $715,763 |
| 09/01/15 | $141,637 |
| 09/08/15 | $300,000 |

| | |
|---|---|
| 09/24/15 | $331,252 |
| 10/01/15 | $250,000 |
| 10/01/15 | $250,000 |
| | $3,680,542 |

## Money laundering

### Williamson County land

20.  On or about September 27, 2013, in the Western District of Texas, Defendant Craighead caused $73,769.72 to be transferred from Creekside Practice Management LLC's commercial bank account at Capital One Bank in Austin in the Western District of Texas to Gracy Title at Gracy's BBVA Compass Bank account in Houston, Texas to fund the purchase by Defendant Craighead of Lot 12, Block A, of Post Oak Estates subdivision, Williamson County, Texas.  The property was located adjacent to Defendant Craighead's residence.  Defendant Craighead made the decision to purchase the property, negotiated the purchase price, signed a contract to purchase the property, directed that title to the property be conveyed by the seller into the name of an adult person selected by Defendant, and supplied the money for the purchase.

21.  Defendant Craighead caused Capital One Bank in Austin to make the cash transfer to the commercial bank account of Gracy Title at BBVA Compass Bank in Houston.  Both banks were then engaged in the banking business in both interstate and foreign commerce.  The depository accounts of both banks were

19

insured by the Federal Deposit Insurance Corporation and both banks were members and users of the Federal Reserve System.

22. The $73,769.72 cash transfer to Gracy Title was completed in interstate commerce by, through, and to the banks which were financial institutions. After the money was transferred from Capital One Bank to the Gracy Title account at BBVA Compass Bank, Gracy Title applied the money to carry out the purchase of the Williamson County, Texas property.

23. The funds that Defendant Craighead directed Capital One Bank to transfer included criminally derived property of a value greater than $10,000 that had been derived from the willful solicitation and receipt of remuneration in return for referring individuals for services and items payable under a federal health care benefits program in violation of Title 42, United States Code, Section 1320a-7b(b)(1), said scheme and offense being described earlier in this Statement of Facts Supporting Guilty Pleas.

24. The criminally derived money used to fund the purchase of the Williamson County, Texas property was traced from its criminal origin to the Gracy Title closing as follows. CCM&D account records at Bank of America in Austin reflect that on September 26, 2013, when CCM&D had a balance of $511.91, a company named A Positive wired $35,000 to the CCM&D bank account. A Positive was a company controlled by the

owner/operators of Victory Medical Center Southcross, LP, aka Innova Hospital San Antonio.  The $35,000 payment was illegal remuneration paid to Defendant Craighead pursuant to the ongoing agreement between Defendant Craighead and the owner/operators of Victory Medical Center Southcross, LP, aka Innova Hospital San Antonio whereby Craighead was paid illegal remuneration to refer federal workers insured by Labor's workers' compensation health care benefit programs to the hospital for services.  The $35,000 was part of a total $2,176,000 paid to Defendant Craighead by the owner/operators of Victory/Innova.  This $35,000 payment of illegal remuneration was a part of the 18 U.S.C. 1347 Health Care Fraud offense alleged in count one of the information described above.  After the $35,000 deposit, which raised the Bank of America account balance to $35,511.91, two additional transfers totaling $8,000 raised the balance to $43,511.91.  Three debits, totaling $3,682.60, reduced the account balance to $39,829.31.

25.  Then, On September 27, 2013, at Defendant Craighead's direction, $35,000 was transferred from the CCM&D account at Bank of America (leaving a $4,829.31 balance) to Defendant Craighead's Creekside Practice Management LLC account at Capital One Bank in Austin.  Giving Defendant Craighead the benefit of the doubt  that the three debits and the balance left in the CCM&D account after the $35,000 transfer  ($3,682.60 + $4,829.31

21

= $8,511.91) were criminally derived, the criminally derived money transferred to the Creekside Practice Management LLC account at Capital One Bank was $26,488.09 ($35,000 - 8,511.91 = $26,488.09).

26.  The Capital One account balance was $7,135.60 prior to receipt of the $35,000 transfer which raised the account balance to $42,135.60.  Defendant Craighead then made additional deposits of $21,500 and $20,000, raising the balance to $83,635.60.  Assuming all of the non-criminally derived money ($7,135.60 + $21,500 + $20,000 = $48,635.60) was included in the $73,769.72 wire to Gracy Title, the remaining $25,134.12 of the transfer was criminally derived.

Mooney M20J aircraft, serial 24-0358
United States registration N201QZ

27.  On April 16, 2013, Family Pharmacy, Inc. (Family), in conjunction with Vidor Pharmacy, LLC (Vidor), transferred $33,050 from its bank account at JP Morgan Chase Bank to Defendant Craighead's CCM&D Consulting bank account at Bank of America in Austin, Texas.  Both banks were then commercial banks engaged in and affecting both interstate and foreign commerce, their depository accounts were insured by the Federal Deposit Insurance Corporation, and both banks were members and users of the Federal Reserve System.  The $33,050 payment, was illegal remuneration paid to Defendant Craighead and CCM&D Consulting

for referring federally insured health care patients pursuant to the scheme to violate Title 42, United States Code, Section 1320a-7b(b)(1) as described earlier in this Statement of Facts Supporting Guilty Pleas. The money was the proceeds of specified unlawful activity. The $33,050 payment was one of the series of illegal remuneration payments made by Family and Vidor to Craighead and CCM&D Consulting set forth on pages 20 and 21 above. On April 18, 2013, Craighead caused $10,500 to be wired from his CCM&D Consulting account at Bank of America to an account set up by the owners of a Mooney M20J aircraft, with identifying numbers: serial 24-0358, United States registration N201Q. More than $10,000 of the wire transfer was money from the $33,500 illegal remuneration payment by Family and Vidor described above. The account was located at Capital One Bank in Beaumont, Texas, and the wire transfer was a payment by Defendant Craighead for the purchase of the aircraft.

28. At the conclusion of the factual recitation, above his signature, Craighead stated he had read the statement of facts, had discussed it with his attorney, and that he agreed the government possessed legally admissible witness testimony and documentary evidence to prove the statement of facts.

## AUTHORITIES

### Factual Specificity Required

Rule 2(b)(2) of the Rules Governing Section 2255

Proceedings requires the moving party to "state facts supporting each ground" for relief.  Unsworn bald assertions are insufficient to state a 2255 claim.  *Hernandez v. United States*, 2016 WL 1460335 (S.D. of Illinois).

*Strickland v. Washington* Ineffective Assistance of Counsel

Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant seeking relief pursuant to 28 U.S.C. § 2255 must first establish that his counsel's performance was constitutionally deficient.  *Id*. at 2064.  In order to be deficient, counsel's performance must be "outside the wide range of professionally competent assistance." *Id*. at 690. If he succeeds in satisfying the first hurdle, then the defendant must also demonstrate that the deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694, See also *United States v. Drones*, 218 F.3d 496, 500 (5th Cir. 2000).

The proper standard for attorney performance is that of reasonably effective assistance.  *Strickland,* 466 U.S. at 693; 104 S.Ct. at 2052 (1984).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate

24

the conduct from counsel's perspective at the time. *Id*. at 689.
The judicial scrutiny of counsel's performance must be highly
deferential, and a court must indulge a strong presumption that
counsel's conduct falls within that wide range of reasonable
professional assistance. *Id*. at 689. See also *Drones*, 218 F.3d
at 500.

"Counsel's actions are usually based on informed strategic
choices made by the defendant and on information supplied by the
defendant." *Strickland*, 466 U.S. 668, 104 S.Ct. at 2052 (1984)
presumed that counsel's failure to raise a particular issue or
present specific pieces of evidence was a strategic choice. *Id*.

Guilty Pleas Under Oath And Signed
Plea Agreements Are Accorded Great Evidentiary Weight

A defendant's "solemn declarations in open court carry a
strong presumption of verity." *Blackledge v. Allison*, 431 U.S.
63, 74, 97 S.Ct. 1621, 1629 (1977). A defendant ordinarily may
not refute his sworn testimony given under oath at a plea
hearing. *United States v. Cervantes*, 132 f.3d 1106, 1110 (5th
Cir. 1998). Official documents, such as a plea agreement signed
by the defendant are entitled to a presumption of regularity and
are accorded great evidentiary weight. *Hobbs v. Blackburn*, 752
F2d 1079, 1081 (5th Cir. 1985).

ARGUMENTS IN RESPONSE TO CRAIGHEAD'S ALLEGATIONS

Craighead raises four grounds for relief, each stated in

conclusion form. Craighead does recite facts as required by
Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings.
Thus, Craighead's motion should be dismissed for non-compliance
with Rule 2(b)(2).

<u>Issue One</u>

Craighead alleges attorney James Bell was constitutionally
ineffective for not investigating Craighead's competency and
mental health before recommending a plea agreement and says
attorney Bell should have achieved a better result (Memorandum
at 21).

<u>Response to Issue One.</u>  Craighead's first point of error is
a re-hash of the same alleged incompetency and attack on
attorney Bell's legal representation considered and rejected by
the Court in the June 10, 2016 evidentiary hearing on
Craighead's motion to withdraw guilty plea.  His 2255 motion
concludes that plea counsel Bell was ineffective by not pursuing
the incompetency issue, but Craighead states no facts in
support.  Rule 2(b)(2) of the Rules Governing Section 2255
Proceedings requires a movant to "state the facts supporting
each ground."  Thus, Craighead's first point of error should be
dismissed for failure to comply with Rule 2(b)(2).

Moreover, Craighead's first point of error has no merit and
should be denied because: (a) attorney Bell did investigate
Craighead's competence, (b) attorney Bell determined that

Craighead was competent, and (c) Craighead was competent when signing his plea agreement, when pleading guilty before the Magistrate Judge, as well as when orchestrating his sophisticated crime schemes.

After Craighead pled guilty and cooperated with government investigators for approximately two months, he was arrested and jailed for committing new felonies and smoking marihuana.  In a jailhouse *about face*, Craighead fired attorney Bell and, with new counsel, moved to withdraw his guilty plea, claiming to have been incompetent when signing his plea agreement.  Craighead also claimed he mistakenly followed Bell's advice, felt misled by Bell, and did not knowingly enter into the plea agreement negotiated by Bell.  Thus, even before his sentencing and with two newly retained attorneys, Craighead alleged and tried to prove attorney Bell was ineffective for not determining he was incompetent and for not using incompetence to Craighead's advantage.  The District Court, after listening to Craighead's expert testimony, reading the experts' reports, and reviewing Craighead's sworn plea colloquy, determined Craighead's experts' claims of his incompetence, in light of all the facts, did not make sense.  Prior to the motion to withdraw guilty plea hearing, the Court read the transcript of Craighead's December 4, 2015 guilty plea colloquy twice and listened to the recording (Pages 6, 30).  The Court observed that Magistrate Judge Lane,

27

before whom Craighead pled guilty, was one of the nicest people you could know and was patient. The Court expressed skepticism toward Craighead's experts' opinions that Craighead was incompetent when signing his December 4 plea agreement, because on the same day he also pled guilty before Magistrate Judge Lane, freely admitting his guilt by giving straight answers to the magistrate (Page 33). The Court observed that the notion Craighead did not know what he was doing was "bizarre" and "doesn't make any sense at all" (Page 33).

Craighead's sworn guilty plea colloquy with the Magistrate Judge revealed a rational Craighead conversant with the charges against him, the potential penalties, his plea agreement, and the facts proving his guilt. It revealed satisfaction and a working relationship with his counsel. Craighead testified he was competent, that he understood the charges, his plea agreement, and the factual basis, was satisfied with his counsel, and was pleading guilty because he was guilty. Craighead's general 2255 allegations do not factually controvert Craighead's sworn guilty plea testimony or attempt to explain it. Excerpts from the guilty plea colloquy follow.

Adequate time with counsel,
Disclosure of all facts to counsel,
<u>Discussion of defenses with counsel</u>

"Mr. Craighead, have you had enough time to talk with Mr. Bell and your other attorneys with regard to the charges that

you face in this case?"  A:  "Yes, your Honor, I have" (Page 5)

     "Have you told your attorneys everything that you know

about the facts and circumstances that described in this

superseding information?"  A:  "Yes, your Honor, I have" (Page

5).

     "Sometimes a man in your position believes he has a defense

to criminal charges.  To the extent you believed you had a

defense or defenses to the charges that are described in the

superseding information, did you talk with that – with your

attorneys about that issue before coming to court?"

     A:  "Yes, your Honor.  I'm – we're past that.  We're good"

(Pages 5-6)

Competency

     "Mr. Craighead, are you suffering this afternoon from any

mental or physical condition, or are you under the influence of

any drugs, alcohol, or medicine that interfere with your ability

to understand my questions or what you're doing here today?"

     A:  "No, your Honor" (Page 6).

Satisfaction with counsel, No complaints

     "Are you satisfied with the representation that Mr. Bell

and your other attorneys have provided to you in this case?"

     A:  "Yes, sir.  I am, your Honor" (Page 6).

     When the Court asked, "[D]o you have any complaints

whatsoever about the performance of your attorney in your

29

defense?", Craighead responded, "No, your Honor. I don't" (Page 6).

Reviewed plea agreement,
Discussed with attorney,
Attorney answered questions,
Understood plea agreement,
Agreed to be bound by agreement

"Have you reviewed the entire plea agreement carefully with your attorney?" A: "Yes your Honor, I did" (Page 7).

"To the extent you had questions about any portion, word, principle, issue or law described in your plea agreement, did you talk with your lawyer about that?" A: "We covered — yes. I've covered everything. Thank you" (Page 7)

"Was your lawyer able to answer any questions that you may have had?" A: "They did. They answered the questions. Thank you" (Page 7).

"Now I'm asking you under oath: Do you understand this entire plea agreement?" A: "Yes, your Honor, I do" (Page 7).

"And do you agree to follow it and be bound by it?" A: "Absolutely, your Honor" (Page 7)

"Mr. Craighead, one last chance. Are you going to follow this plea agreement after telling me that you understand it?" A: "Absolutely, 100 percent, your Honor" (Page 13).

Superseding information:
Read it entirely several times,
Reviewed carefully with attorney,
Understood charges in both counts

"Have you read that entire document?" A: "Yes, your Honor. I have several times" (Page 15).

"And have you reviewed it very carefully with Mr. Bell?" A: "Yes, your Honor, I have" (Page 15).

"And was Mr. Bell able to answer any questions about any words, principles, laws, or issues that are described in the superseding information?" A: "Mr. Bell answered every question I had. He did a thorough job" (Page 15).

"Reminding you that you're under oath, can you tell me now under oath that you understand what you're charged with in Counts 1 and 2 of your superseding information?" A: Yes, your Honor" (page 15).

Pled guilty because guilty,
Read entire factual basis,
Reviewed factual with attorney,
Understood factual basis,
<u>Factual basis true and correct</u>

"Reminding you that you're under oath, are you telling me that you're pleading guilty to this charge because you are guilty and for no other reason?" A: "That is correct, your Honor" (Page 27).

"One of my final obligations is to establish whether there's a factual basis or an independent reason to believe that you are guilty of the offense to which you have plead. I note that you and your attorney and the lawyer for the government took the time in your plea agreement in a document that's

entitled, 'Statement of Facts Supporting Guilty Plea.' I
believe it begins on page 12 of the plea agreement. Again, very
detailed facts in relation to names and numbers and figures.
Have you read that entire statement of facts?" A: "Yes, your
Honor, I have" (Page 27).

"Have you gone over it carefully with your lawyer?" A:
"Yes, sir, I have" (Page 27).

"Do you understand that statement of facts?" A: "I do
understand the statement of facts, your Honor" (Page 27).

"Reminding you that you are under oath, are those facts set
out in the 'Statement of Facts Supporting Guilty Pleas,' are
those facts accurate?" A: "Yes, your Honor" (Page 28).

"To the extent they describe your behavior and what you did
wrong in relation to both counts of the superseding information,
are those facts true?" A: Yes, your Honor" (Page 28).

<u>Craighead's comprehension</u>

"Mr. Craighead, do you – I've gone fast. I'm a fast
talker, but did you understand everything we've gone over?"
A: "I've understood absolutely everything, your Honor. And
thank you for your explanations. I really appreciate it" (Page
38).

Craighead's sworn testimony to the Court and Craighead's
signed plea agreement and signed statement of facts completely
contradict Craighead's 2255 motion wherein he states that his

32

attorney should have discovered he was incompetent and that he (Craighead) "failed to appreciate the consequences of the agreement into which he was entering." The careful Magistrate Judge directly asked about, and Craighead disavowed, any issue regarding competence. Craighead told the Magistrate Judge that he had explored all possible defenses with his attorneys. The Magistrate Judge questioned Craighead about the superseding information, the plea agreement, and the factual basis and learned from Craighead that he had read them all and reviewed them with his counsel. Craighead offered no reservation or complaint. Craighead testified he was guilty and pleading guilty because he was guilty. Further, Craighead testified the statement of facts was true and accurate in describing what he did wrong. Repeatedly, after the Magistrate Judge reminded Craighead he was under oath, Craighead re-affirmed his admissions.

Craighead offers no facts to rebut his sworn guilty plea testimony, his plea agreement, or the statement of facts. Nor does Craighead suggest the transcript is inaccurate, that he misspoke, or that his words were misconstrued. In light of this record, wherein Craighead offered no facts to rebut his sworn guilty plea testimony, the Fifth Circuit precedent in *Blackledge v. Allison, United States v. Cervantes*, and *Hobbs v. Blackburn* dictates that Craighead's motion fails on Issue One.

Finally, Attorney Bell, an experienced attorney who had worked for months as a part of an experienced team of attorneys and former federal agents investigating Craighead's case and communicating with him at length, advised the Magistrate Judge that Craighead was competent and had a rational and factual understanding of the case against him. Immediately prior to the colloquy with Craighead, the Magistrate Judge inquired of Attorney Bell, "Do you believe he (Craighead) has a factual and rational understanding of what he's charged with and what he's doing here today?". Bell responded, "Yes, your Honor." Next, the Court asked, "And lastly, do you believe he's competent to enter a plea" and Bell responded, "Yes, your Honor." For Bell and the defense team, experienced in the defense of criminal cases, the competency questions were expected because the Court always asks defense counsel about the defendant's competency. Bell's answers were candid and based upon months of interaction with Craighead.

The accompanying affidavit of attorney Bell, which is hereby incorporated into this response, reflects that a seasoned team of attorneys and former federal agents for months investigated, gathered, and catalogued evidence, communicated extensively with Craighead regarding the evidence and potential defenses, and familiarized themselves with Craighead and his financial and business operations, as well as the government's

case against him.  Knowing that a defendant's competency and
state of mind are always issues to be considered in criminal
prosecutions and defenses, the defense team discussed
Craighead's competency and state of mind within the team, and
then frankly discussed it with Craighead.  Attorney Bell and the
defense team satisfied themselves that Craighead was competent
and had a rational and factual understanding of the case against
him, the Court documents, and the proceedings.  Attorney Bell
then so advised the Court.

According to Bell's affidavit, in the days prior to the
entry of Craighead's guilty plea that occurred on December 4,
2015, attorney Bell and the defense team met with Craighead for
several days in his suite at the Four Seasons Hotel on the lake
in downtown Austin.  Bell and the defense team read and
discussed with Craighead every line and word of the superseding
information, the plea agreement, and the factual basis.  Line by
line, they read each document together, answered Craighead's
questions, and assured that Craighead understood the documents,
wanted to enter the plea agreement, wanted to plead guilty, and
wanted to cooperate with government investigators to earn credit
toward his sentence.

Attorney Bell and the defense team investigated the issue
of Craighead's competency/state of mind by: (a) personally
interacting with him while studying years of his business and

financial activities, (b) discussing Craighead's competency/state of mind among the defense team members, and (c) frankly discussing competency/state of mind directly with Craighead. Attorney Bell and the defense team determined Craighead was competent. Craighead told the defense team he was competent and, under oath, told the Magistrate he was competent. Craighead demonstrated competence throughout a lengthy plea colloquy just as he had demonstrated mental competence and acumen through years of orchestrating his elaborate kickback deals. It is telling that Craighead's belated claim of incompetence originated after only he was jailed for violating both his plea agreement and bail conditions.

Craighead was competent. Attorney Bell was constitutionally effective. Craighead's first point of error is without merit.

<u>Issue Two</u>

Craighead next alleges attorney Bell was constitutionally ineffective for not advising Craighead of the safe harbor defense to the anti-kickback act of which he was convicted (Memorandum 24-26).

<u>Response to Issue Two.</u> Craighead's claim is false. As stated by James Bell in his affidavit and as is reflected in one of Bell's three March 22, 2016 letters urging Craighead not to attempt to withdraw his plea (Exhibit B to Bell affidavit), Bell and the defense team investigated potential safe harbor defenses

to the anti-kickback statute, searched for evidence of
Craighead's reliance on the advice of healthcare law attorneys
relating to safe harbors (See Exhibits E, F, G, and H to Bell
affidavit), discussed potential safe harbor defenses and
evidence with Craighead, and determined that the defense was not
applicable to Craighead's conduct.  After Bell and the defense
team fully discussed the facts and evidence developed by the
defense investigation with Craighead and answered his questions,
Craighead agreed that there was no safe harbor defense
applicable to his conduct.  Craighead then made the decision to
forego the use of safe harbors as a defense and to enter into a
plea agreement.

Craighead's 2255 motion contains no facts, no affidavit, no
documents, and no evidence of a safe harbor defense for any of
the 130 plus kickbacks alleged against him, but promises that
"he possesses documentation sufficient to warrant an acquittal
from a jury" (Memorandum at 26).  To prevail, a 2255 movant must
allege and prove with facts that a valid legal defense existed
and that his attorney incompetently failed to raise it.  Section
2255 and Rule 2(b)(2) require it.  Craighead, having consulted
almost two years with his third legal team, is unable to
identify facts showing what his safe harbor defense was.  In
fact, there was no such defense.

Issue Two conclusion.  Attorney James Bell and the defense

team advised Craighead of potential safe harbor defenses, thoroughly searched for a safe harbor defense, found none, and correctly advised Craighead that there was no safe harbor defense. Attorney Bell's representation of Craighead regarding the safe harbor defense issue was constitutionally effective. Craighead's second point of error is without merit.

Issue Three

Craighead alleges attorney Olga Selig, who Craighead hired to replace his original counsel James Bell after pleading guilty, provided ineffective assistance by failing to timely file the motion to withdraw Craighead's guilty plea. Craighead also alleges that "a timely filed motion would have succeeded" (Memorandum at 29).

Response to Issue Three. Attorney Seelig was not constitutionally ineffective in filing Craighead's motion to withdraw guilty plea on June 10, 2016. The Court appropriately conducted a hearing on the merits of Craighead's motion and applied the appropriate legal standard set out in *United States v. Carr*, 740 F.2d 339, 343-344 (5th Cir. 1984). At the hearing, attorney Seelig offered testimony from retained psychiatrist Robert Cantu that Cantu found Craighead legally competent when he examined Craighead at the jail, but found that Craighead was legally incompetent when he signed his plea agreement on December 4, 2015. On cross-examination, the psychiatrist

38

conceded that he did not interview or even speak with Craighead's guilty plea counsel and that he did not review Craighead's sworn guilty plea colloquy (Transcript 18-20). Through attorney Seelig, Craighead asserted his innocence and said he was misled by attorney James Bell. However, Craighead did not to testify or submit an affidavit stating how James Bell misled him.

The Court, prior to the motion to withdraw hearing, read the transcript of Craighead's December 4, 2015 guilty plea colloquy twice and listened to the recording (Pages 6, 30). The Court observed that Magistrate Judge Lane, before whom Craighead pled guilty, was one of the nicest people you could know and was patient. The Court expressed skepticism toward Craighead's experts' opinions that Craighead was incompetent when signing his December 4 plea agreement, because on the same day Craighead, in pleading guilty before the Magistrate Judge, freely admitted guilt by giving straight answers to the Magistrate (Page 33). The Court observed that the notion Craighead did not know what he was doing was "bizarre" and "doesn't make any sense at all" (Page 33).

Under _United States v. Carr_, 740 F.2d 339, 343-344 (5th Cir. 1984), the standard for allowing withdrawal of a guilty plea before sentencing is whether "for any reason the granting of the privilege seems fair and just." Factors to be considered are:

(1) whether or not the defendant has asserted his innocence, (2)
whether or not the government would suffer prejudice if the
withdrawal was granted, (3) whether or not the defendant has
delayed in filing his withdrawal motion, (4) whether or not the
withdrawal would substantially inconvenience the court, (5)
whether or not close assistance of counsel was available, (6)
whether or not the original plea was knowing and voluntary, and
(7) whether or not withdrawal would waste judicial resources,
and, as applicable, the reason why defenses advanced later were
not proffered at the time of the original pleading, or the
reasons why a defendant delayed in making his withdrawal motion.
The Court applied the United States v. Carr factors and denied
the motion on the merits after a hearing in which the Court
considered and discounted the opinions of Craighead's retained
experts after weighing their opinions against Craighead's sworn
guilty plea colloquy, as recorded and transcribed.  Seelig
fulfilled her duty to Craighead in having the Court conduct a
hearing on the motion to withdraw guilty plea and listen and
carefully consider his evidence.

Moreover, in light of the difficult representation foisted
upon attorney Seelig by Craighead, the June 10, 2016 filing of
Craighead's motion to withdraw is understandable.  Craighead,
after: (a) entering a plea agreement, (b) pleading guilty, (c)
submitting to multiple debriefings with the government wherein

he admitted guilt, (d) being caught stealing hundreds of thousands of dollars from the government while on bail, (e) smoking marihuana while on bail, (f) and firing his attorney, hired Seelig to fix things.  This would have been a tall order for any group of lawyers.

Based on attorney Seelig's affidavit, which is incorporated into this response, Seelig correctly advised Craighead that before taking any action she would have to immerse herself into the facts and prior proceedings of this complicated case and to evaluate it before advising Craighead what to do.  Craighead agreed.  Attorney Seelig and her co-counsel were dealt a difficult hand and tried to accomplish their client's wishes while working on a Court ordered schedule and sagely trying not to antagonize the prosecution.  Attorney Seelig and co-counsel, with difficulty, obtained expert opinions, reports, and testimony to determine client competency, while studying a difficult kickback case and complicated plea documents.  The task consumed all of attorney Seelig's time.  The difficult sequence of events described by attorney Seelig, which centered on keeping the client Craighead informed, makes it completely understandable why the motion to withdraw guilty plea was filed on June 10, 2016.  The amount of work and time required to represent Craighead in his unique situation and to fulfill the attorney's duties of investigation, professionalism, and

communication dictated it.  Moreover, Craighead was informed of and agreed with the actions taken by attorney Seelig.

Attorney Seelig and her co-counsel were successful in having the Court conduct a factual hearing on the merits of Craighead's motion to withdraw guilty plea at which the examinations and opinions of their professionals were placed before the Court and considered in detail.  The motion to withdraw guilty plea was simply without merit.

Craighead has failed to demonstrate either a constitutionally deficient performance or prejudice caused by Attorney Seelig.  Craighead's third point of error is without merit.

<u>Issue Four</u>

. Craighead alleges attorney Olga Seelig provided ineffective assistance by failing to subpoena witnesses Deacon Walker and psychologist William Dailey for the motion to withdraw hearing.

<u>Response to Issue Four</u>.  Attorney Seelig and her co-counsel arranged for the voluntary appearance of Deacon Walker as a character witness at the June 10, 2016 sentencing.  Psychologist William Dailey voluntarily agreed to appear for the motion to withdraw hearing scheduled for the same day.  Both witnesses appeared in Court on the morning of June 10, but left before Craighead's motion hearing and sentencing in the afternoon.

According to the affidavit of attorney Seelig, Deacon Walker was a character witness who offered to speak on behalf of Craighead's good character, but who had no personal knowledge of the case and had nothing to say about the motion to withdraw. Other character witnesses voluntarily appearing for Craighead provided substantial good character evidence and Walker's testimony would have been cumulative on that issue. Craighead alleged Deacon Walker's absence from the motion to withdraw hearing for lack of a subpoena prejudiced his motion to withdraw. Since Walker was only a character witness with no knowledge of the motion to withdraw facts, would have had no bearing on the motion.

Dailey performed psychological testing of Craighead at the jail. His report was filed in the Court on June 2, 2010 and read by the Court. Dr. Robert E. Cantu, M.D., Craighead's retained psychiatrist who testified in the motion to withdraw hearing, testified that he had reviewed Dailey's report, had talked with him earlier in the day, and that he relied on Dailey's testing in forming his opinions. Testimony by Dailey would have been cumulative of psychiatrist Cantu's testimony and repetitive in that Cantu considered Dailey's testing in formulating his medical opinions and testified that he did so. Craighead suffered no prejudice because of Dailey not being subpoenaed.

Thus, attorney Olga Seelig did not provide constitutionally ineffective assistance of counsel by not subpoenaing Dailey and Walker. Craighead's fourth point of error is without merit.

### EVIDENTIARY HEARING IS UNNECESSARY

A motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief. *U.S. v. Auten,* 632 F.2d 478 (5th Cir.1980). There are no issues of contested fact to be determined and Craighead is not entitled to relief. An evidentiary hearing is not required.

Wherefore premises considered, the United States prays that Craighead's Motion to Vacate, Set Aside, or Correct Sentence be in all things denied.

Richard L. Durbin, Jr
United State Attorney

_____/s/_____
James Blankinship
Assistant United States Attorney
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7100
State Bar of Texas #2456750
jim.blankinship@usdoj.gov

### CERTIFICATE OF SERVICE

This is to certify that on this 8th day of November, 2017 a true and correct copy of the foregoing Government's Response to Motion to Vacate, Set Aside or Correct Sentence was electronically filed with the Clerk of the Court using the

CM/ECF System causing a copy of this response to be

electronically delivered to Garry Wayne Craighead's counsel:

George Parnham

_____/s/_____

James Blankinship
Assistant United States Attorney